## THE STATE vs. DOXTATER.

*Jurisdiction of state over tribal Indians.*

1. The jurisdiction of a state, when not restricted by existing treaties with Indian tribes, or by the act admitting such state into the Union, and except so far as it is restricted by the authority of congress under the federal constitution to "*regulate commerce* with the Indian tribes," extends to all members of such tribes within the territorial limits of the state.

2. The criminal laws of this state apply to the Indians on their reservations within the state; and the circuit court for Brown county has jurisdiction of all violations of such laws committed, whether by Indians or others, in the Oneida reservation, which is included within the boundaries of that county as fixed by law.

CERTIFIED on exceptions from the Circuit Court for *Brown* County.

The case is stated in the opinion.

The cause was submitted on the brief of *John J. Tracy* for the defendant, and that of the *Attorney General* for the state.

Defendant's counsel contended, that if the omission of the legislature to except the members of the Oneida nation, on its reservation, from the operation of our criminal statutes, makes them liable to the penalties therein described, then the omission to except them from the operation of our civil laws

must work the same result.   Against ·this view of the author-
.ity of the state legislature and of the effect of the statutes,
counsel argued substantially as follows: 1. In the treaty of
December 2, 1794, the Oneidas are styled a "nation."   In the
treaty of 1784 with the " Six Nations," it is provided that the
" Oneida Nation " shall be secured in the possession of the
lands on which they are settled; the treaty of 1789 again con-
firms the " Oneida Nation " in the possession of its lands; and
the treaty of Nov. 11, 1794, confirms the " Oneida Nation "
in possession of the lands held by it by virtue of treaties with
the state of New York; and it cedes to the United States the
right to make a wagon road through the Indian territory.
7 U. S. Stats. at Large, pp. 15, 33, 44, 47–8.   Prior to 1825, the
Oneida Indians had left the state of New York, and established
themselves on territories including ·their present reservation,
which had been ceded to them by the Menomonees.   7 U. S.
Stats. at Large, p. 272; p. 274, art. VIII.; pp. 242–3, 550.   By
the treaty of February 8, 1831, the Menomonees ceded to the
United States, for the use of the New York Indians, territory
including that now held by the Oneidas.   By that treaty the
Menomonee *nation* claimed nearly all of Wisconsin and Mich-
igan.   7 U. S. Stats. at Large, p. 345, par. 6.   This treaty was
modified by the U. S. Senate, and a new treaty was made Octo-
ber 27, 1832, ceding to the United States for the New York
Indians, lands including the present Oneida reservation.
7 U. S. Stats., 405–7.   On the last page cited, the preamble
recites that George B. Porter, " the agent of the United States,"
after failing in one object, " endeavored to procure the assent
óf the said chiefs and head men of the Menomonee nation to
· the best practicable terms short of those proposed by the sen-
ate; " and that, " after much labor and pains, entreaty and
persuasion," he obtained the consent of the Menomonees to
certain terms.   Following this treaty (p. 409) is a request from
the New York Indians that the same may be ratified, because
they believed that the terms proposed were the best that could

be obtained from the Menomonees.    In 1838, the present Oneida reservation was provided for; and it is declared that these lands are to be held as other Indian lands are held.  7 U. S. Stats. at Large, 556.  The treaties with the Menomonees show how complete was the right which the United States recognized them as having in their lands.  The act of congress establishing the territorial government of Wisconsin, contains a proviso, "that nothing in this act contained shall be construed to impair the rights of *person* or property now appertaining to any Indians within the said territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, or to impair the obligations of any treaty now existing between the United States and such Indians, or to impair or anywise to affect the authority of the United States to make any regulations respecting such Indians, their lands, property or other rights, which it would have been competent to the government to make if this act had never been passed."  As to the treaties above cited, counsel contended that they recognize the Oneida tribe of Indians as an independent nation, whose territory the United States have no right to intrude upon, except as the right is expressly conceded by treaty; and that none of them concede to the general government any right to interfere with that nation in its management of its internal concerns according to its laws and customs. Counsel also cited *The Cherokee Nation v. Georgia*, 5 Pet., 1, and *Worcester v. Georgia*, 6 id., 515, and quoted at length from the prevailing opinions in those cases, as establishing the doctrine that an Indian nation, living on its own reservation, though within the bounds of a state, while not a "foreign state" so as to be entitled to sue in the courts of the United States, is yet a distinct political community, with the right of self-government, dependent on no other power in the management of its internal concerns, punishing offenses under its own laws, and possessed of exclusive authority within its own territorial boundaries.  In support of the same view he also

cited the language of KENT, J., in *Goodell v. Jackson*, 20 Johns., 693.

The *Attorney General*, as to the general authority of the state over all places within its territorial limits, cited the first section of the enabling act, the first section of the act admitting this state into the Union, and secs. 1, 4, ch. 1, R. S. He contended that the criminal jurisdiction of a state is coëxtensive with its legislative power, or in other words with its territory (*U. S. v. Bevans*, 3 Wheat., 386–7); and as to the general criminal jurisdiction of the circuit courts, he cited sec. 8, art. VII of the state constitution. He also contended that the title to the tracts of land in the reservation is in the United States (Treaty of 1827, art. III, 7 U. S. Stats. at Large, 304); and that they are expressly "subject to such regulations and alteration of tenure as congress and the president of the United States shall from time to time think proper to adopt." Treaty of 1831, art. I, 7 U. S. Stats. at Large, 342. After observing that the reservation in question lies near to the city of Green Bay, is from twelve to fifteen miles in length by from eight to ten miles in breadth, and is within Brown and Outagamie counties, and that the inhabitants of those two counties nearly surround it, and have daily intercourse with the Indians resident upon it, and that a railroad connecting distant parts of the state runs through the reservation, he cited, as to the jurisdiction of the state over crimes committed within such a reservation, *U. S. v. Ward*, McCahon, 199; *U. S. v. Stahl*, id., 206; *Clay v. The State*, 4 Kans., 49; *U. S. v. Cisna*, 1 McLean, 255; *U. S. v. Bailey*, id., 234; *U. S. v. Sa-coo-da-cot*, 1 Abb., U. S., 386; *State v. Foreman*, 8 Yerg., 256–318; *Caldwell v. State*, 1 Stew. & Port., 327; *State v. Tassels*, Dudley (Ga.), 229; *State v. Ta-cha-na-tah*, 64 N. C., 614. He also distinguished the case of *Worcester v. Georgia*, in which the statute of Georgia was in conflict with an act of congress.

TAYLOR, J. The defendant was tried upon an information

for adultery, in the circuit court for Brown county in this state, and found guilty by the verdict of the jury. The proof showed, and it was admitted upon the trial, that the adultery was committed at the house of the defendant and within the limits of the Oneida reservation; that the defendant was an Oneida Indian, and a member of the tribe of the Oneidas living on said reservation; and that the woman with whom he committed the adultery was a married woman, not an Indian or a member of the tribe.

After the conviction, the defendant moved to set aside the verdict, on the following grounds: "That the said alleged crime, as charged in the information, was committed within the territorial limits of the said Indian reservation, and out of and beyond the jurisdiction of said court, and not within the county of Brown or elsewhere within the jurisdiction of said court; that the defendant, at the time of his arrest for said alleged crime, was at his house upon the Oneida Indian reservation, and not within either the criminal or civil jurisdiction of said court, or of the state of Wisconsin; that the state ought not to maintain said action against him, because of his being an Indian and a member of the Oneida nation of Indians; that various treaties have from time to time been made and entered into by the government of the United States with the Chippewa, Winnebago, Menomoneé, and Oneida nations of Indians, whereby the Oneida reservation of lands was set apart as a home for said Oneida nation of Indians, and said reservation has been held by them as such reservation ever since the year 1825, which treaties have been duly ratified by the senate of the United States; and that, by the terms of said treaties and the laws of the United States, the government of the United States granted to them their present territorial reservation, acknowledging said Oneida nation to be a sovereign nation, and, by virtue of such treaties and laws of the United States, the Oneida nation are authorized and empowered to govern themselves according to their own usages and customs; that

said Indians are under the protection of the United States, and are free from any right of legislative interference by the state; that by the said treaties and laws of the United States, passed for the protecting and governing of the various Indian tribes on the frontiers, the Oneida Indian reservation of land has been set off and guarantied to them for a home, all of which treaties and laws are existing treaties and laws at this day in full force; and that the treaties and laws of the United States contemplate that the Indian territory is completely separate from that of the states, over which Indian territory, and the Indians therein, the state law has no force."

Other grounds were alleged why the verdict should be set aside; but the foregoing sufficiently shows the ground of exceptions in the case. The circuit judge refused to set aside the verdict, and the defendant filed exceptions under the statute, and the same are certified to this court.

The Oneida reservation is within the boundaries of the state of Wisconsin, and also within the boundaries of Brown county, as fixed by law.

The exception presents the grave questions: *first*, whether the state is powerless to punish an act which is declared a crime by the laws of this state, if such act be committed within the limits of the Oneida reservation in this state; and *second*, whether an Indian belonging to the Oneida tribe or nation, and living upon such reservation, can be punished by the laws of this state for any crime committed by him within the limits of such reservation.

In order to deprive the state of its power to exercise one of the most important attributes of sovereignty — the punishment of crime, the protection of the lives, persons and property of those within its borders, and the preservation of peace and good order in every part of the state, — the party alleging the want of such power must show most clear and incontrovertible reasons why such power should not be assumed and exercised.

In order to exempt these Indians, living upon their reserva-

tion within this state, from the jurisdiction of its courts and laws, it must either appear that the territory upon which they reside is no part of this state; or that, although such territory is a part of the state, the Indians are an independent nation and not subject to its laws; or that, by reason of some treaty existing between them and the United States, the state has no authority to extend its laws over them.

Notwithstanding the many controversies over the question as to how far the Indian tribes within the boundaries of the United States are distinct communities, having a kind of independent national existence, still we are of the opinion that as to those tribes living outside of the boundaries of any of the states, the government of the United States has always claimed and exercised the right to legislate for them, and to extend the laws of the United States over the territory occupied by them.

Though in some respects the United States have treated them as distinct peoples, and have from time to time made treaties with them, yet in no case have they treated them as foreign nations. If the United States have accorded to them any of the attributes of a nation, it has been limited always by the express qualification that they were within and under the power and jurisdiction of the United States, and, as was said in the case of *The Cherokee Nation v. The State of Georgia*, 5 Peters, 1, by Chief Justice MARSHALL, in commenting upon the peculiar relations of the Indian tribes to the United States: "The condition of the Indians in relation to the United States is, perhaps, unlike that of any other two peoples in existence. In general, nations not owing a common allegiance are foreign to each other. But the relation of the Indians to the United States is marked by peculiar and cardinal distinctions, which exist nowhere else." He then goes on to show that all the territory occupied by the Indians is admitted to be within the United States, and within its jurisdictional limits, and the ultimate right to the soil of the lands occupied by the tribes is claimed by the United States, and then adds: "It may well

be doubted whether those tribes which reside within the acknowledged boundaries of the United States can, with strict accuracy, be denominated foreign nations. They may, more correctly perhaps, be denominated domestic dependent nations. They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession when their right of possession ceases. Meanwhile they are in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian. . . . They and their country are considered by foreign nations, as well as by ourselves, as being completely *under the sovereignty and dominion of the United States,* and any attempt to acquire their lands or to form a political connection with them would be considered by all as an invasion of our territory and an act of hostility." Justice JOHNSON, in the same case, asks the question: "By what attributes is the Cherokee nation identified with other states? The right of sovereignty was expressly assumed by Great Britain over their country at the first taking possession of it, and has never since been recognized as in them, otherwise than as dependent upon the will of a superior. The right of legislation is in terms conceded to congress by the treaty of Hopewell [a treaty made with the Cherokees], whenever they choose to exercise it; and the right of soil is held by the feeble tenure of hunting grounds, and acknowledged on all hands subject to a restriction to sell to no one but the United States. . . . They have in Europe sovereign and demi-sovereign states, and states of doubtful sovereignty. But this state, if it be a state, is still a grade below them all; for not to be able to alienate without permission of the remainderman or lord, places them in a state of feudal dependence."

In the same case Justice BALDWIN says (p. 49): "While the different nations of Europe respected the rights of the natives as occupants, they asserted the ultimate dominion to be in themselves, and claimed and exercised, as a consequence of this ultimate dominion, the power to grant the soil while yet in

the possession of the natives.   These grants have been under-
stood by all to convey a title to the grantees subject only to
the Indian right of occupancy.  .  .  .   I feel it my duty to
apply them to this case.   They are in perfect accordance with
those on which the governments of the united and individual
states have acted in all their changes; they were asserted and
maintained by the colonies before they assumed independence.
While dependent themselves on the crown, they exercised
all the rights of dominion and sovereignty over the terri-
tory occupied by the Indians; and this is the first assertion by
them of rights as a foreign state within the limits of a state.
If their jurisdiction within their boundaries has been unques-
tioned until this controversy — if rights have been exercised
which are directly repugnant to those now claimed, — the
judicial power cannot divest the states of rights of sovereignty,
and transfer them to the Indians, by decreeing them to be a
nation, a foreign state preëxisting and with rightful jurisdic-
tion and sovereignty over the territory they occupy.   This
would reverse every principle on which our government has
acted for fifty-five years, and force, by mere judicial power,
upon the other departments of this government and the states
of this Union, the recognition of the existence of nations and
states within the limits of both, possessing dominion and juris-
diction paramount to the federal and state constitutions.   It
will be a declaration, in my deliberate judgment, that the sov-
ereign power of the people of the United States and Union
must hereafter remain incapable of action over territory to
which their rights in full dominion have been asserted with
the most rigorous authority, and bow to a jurisdiction hitherto
unknown, unacknowledged by any department of the govern-
ment, denied by all through all time, unclaimed till now, and
now declared to have been called into exercise, not by any
change in our constitution, the laws of the Union or the states,
but preëxistent and paramount over the supreme law of the
land."

The foregoing remarks were made in a case involving the claim of the Cherokee Indians, one of the most powerful tribes in the United States, to be an independent nation, and their claim was denied. In the case of *State of New York v. Dibble*, 21 How., 366, in which it was alleged that a law of the state of New York which prohibited a white man from intruding upon the reservation of the Seneca Indians in that state, was void as being in conflict with the laws of congress or the constitution of the United States, Justice GRIER, who delivered the opinion of the court, says: "Notwithstanding the peculiar relations which these Indians hold to the government of the United States, the state of New York had the power of a sovereign over their persons and property, so far as it was necessary to preserve the peace of the commonwealth, and protect these feeble bands from imposition and intrusion. The power of the state to make such regulations to preserve the peace of the commonwealth is absolute, and has never been surrendered." In the case of *United States v. Rogers*, 4 How., 567, which was the case of an indictment for murder committed within the territory of the Cherokee Indians, Chief Justice TANEY says: "The country in which the crime is charged to have been committed is part of the territory of the United States, and not within the limits of any particular state. It is true that it is occupied by the tribe of Cherokee Indians. But it has been assigned to them by the United States as a place of domicil for the tribe, and they hold and occupy it with the assent of the United States, and under their authority. The native tribes who were found on this continent at the time of its discovery, have never been acknowledged or treated as independent nations by the European governments, nor regarded as the owners of the territories they respectively occupy. On the contrary, the whole continent was divided and parcelled out, and granted by the governments of Europe as if it had been vacant and unoccupied land,

and the Indians continually held to be, and treated as, subject to their dominion and control.

"It would be useless at this day to inquire whether the principle thus adopted is just or not; or to speak of the manner in which the power claimed was in many instances exercised. It is due to the United States, however, to say that while they have maintained the doctrine upon this point which had been previously established by other nations, and insisted upon the same powers and dominion within their territory, yet from the very moment the general government came into existence, to this time, it has exercised this power over this unfortunate race in the spirit of humanity and justice. . . . It is our duty to expound and execute the law as we find it; *and we think it too firmly and clearly established to admit of dispute, that the Indian tribes residing within the territorial limits of the United States are subject to their authority, and when the country occupied by them is not within the limits of one of the states, congress may by law punish any offense committed there, no matter whether the offender be a white man or an Indian.*"

In 1856 the Hon. Caleb Cushing, as attorney general of the United States, in giving an opinion upon the question of the citizenship of Indians, says: "The simple truth is plain, that the Indians are *subjects* of the United States, and are not, in mere right of home birth, citizens of the United States. The two conditions are incompatible. The moment it comes to be seen that the Indians are domestic subjects of this government, that moment it is clear to the perception they are not the sovereign constituents of the government." 7 Opinions of Attorneys General, 749.

Again, in 8 Opinions of Attorneys General, the same learned attorney general says: "There was a time when the true relation of Indians to the United States was not so clearly seen as it now is. We had been accustomed to make treaties with

them as if they were independent of us ; that was an error. We dealt with their petty tribes as nominal nations; that led to strange misconceptions. We had respected their assumed rights; that is, had left them to their savage *quasi* independence, instead of, by force, compelling them to enter into some appropriate place in the social organization; and thus they had perished of too much liberty.

"The elaborate investigations of the subject which ensued cleared off all these errors; and discussion ended with the great case of *The Cherokee Nation v. Georgia*, 5 Peters, 1, and *Worcester v. Georgia*, 6 Peters, 515.

"It is the universal doctrine of public law, that the Indians are the domestic subjects of the particular European or American state in which they may happen to be."

The very treaties made by the United States with these tribes clearly show that the United States not only claimed jurisdiction over them, and the right to pass laws for their government, but that when this right was relinquished by the government in any case, and given to the tribes, it was accomplished by a grant of power from the United States to such tribes, and not assumed as an existing right inherent in the tribes, which the United States could not abrogate by virtue of its sovereignty.

In all the early treaties with these tribes it was expressly stipulated, that if any citizen or inhabitant of the United States should commit any crime within the Indian territory upon or against persons, property or rights of the Indians, such person should be tried and punished by the courts of the United States, and not by the laws or customs of the Indians; and that if any Indian committed any robbery or murder or other capital crime on a citizen or inhabitant of the United States, either within or without the Indian territory, such Indian should be delivered up and punished according to the laws of the United States. The fifth article of the treaty made with the Cherokees, ratified May 23, 1836, agrees that the

lands ceded to the Cherokee nation by that treaty shall not at any time thereafter, without the consent of the Indians, be included within the territorial limits or jurisdiction of any state or territory. *But the United States shall secure to the Cherokee nation the right, by their national councils, to make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country, belonging to their own people, or such persons as may have connected themselves with them;* provided, that they shall not be inconsistent with the constitution of the United States, and such acts of Congress as have been or may be passed regulating trade and intercourse with the Indians.

By the fourteenth article of the treaty with the Creek Indians, approved March 24, 1832, the United States guaranty the Creek country west of the Mississippi to the tribe, and agree that no state or territory shall ever have a right to pass laws for the government of such Indians, but they shall be allowed to govern themselves, so far as may be compatible with the general jurisdiction which congress may think proper to exercise over them.

These provisions in the treaties above referred to show that when the Indians claim the right to govern themselves, such right is secured to them by the United States, and that it is not a right inherent in the tribe or nation, which cannot be interfered with by the United States or by the states within which they may be inhabitants. I am unable to find any such provision in any of the treaties made either with the Menomonee, Winnebago or other Indians who occupied the territory which now comprises the state of Wisconsin, or with the Oneida tribe or nation, as to the lands occupied by them in this state; but art. 4 of the treaty of June 10, 1838 (7 U. S. Stats. at Large, 552), provides that the lands secured to them west of the Missouri river, under that treaty, " shall never be included in any state or territory of the Union."

The treaty with the Shawnees made in 1831, in its article 11, contains a provision by which the United States guaranty that the lands granted to the Senecas and Shawnees "shall never be within the bounds of any state or territory, nor subject to the laws thereof."

That it has always been the settled policy of the United States to treat the Indians as dependent upon the government, and, in the language of Attorney General Cushing, "domestic subjects," is further evidenced by the fact that by chapter 120 of the acts of congress, passed in 1871 (U. S. Stats. at Large, 566), it was expressly declared "*that no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe or power with whom the United States may contract a treaty.*" And this law is now section 2079 of the Revised Statutes of the United States.

It seems that from these provisions of the treaties made, and the opinions of the judges of the supreme court and attorney general of the United States, and the general course of legislation respecting the Indian tribes, it is conclusively to be inferred that, in the absence of any treaty or stipulation, the United States, as to those tribes not within any state, have full jurisdiction to pass laws for their government in both civil and criminal matters. *United States v. Rogers*, 4 How., 567. As to those who reside within the limits of any of the states, they, like all other inhabitants or residents, or persons found within the boundaries of such states, must be subject to the laws thereof, unless by some treaty with the United States they are exempted from its jurisdiction, or by the provisions of the constitution of the United States they are not subject to the jurisdiction or laws of the state.

Unless the jurisdiction of the state over the territory occupied by the Indians within its boundaries is prohibited by the act admitting the state into the Union, or by some existing treaty with the Indians occupying such territory at the time of its

admission, there does not seem to be any authority in congress to pass laws for the government or control of such Indians, or to prohibit the states from passing such laws, except the provision of the constitution which authorizes congress to regulate commerce with foreign nations, and among the several states, and with the Indian tribes. Under this provision of the constitution, congress has passed laws regulating trade with the Indians, requiring the taking out of licenses for that purpose, prohibiting the selling of intoxicating liquors to them, and other things which come within the power to regulate commerce; but it never has been contended that under this provision congress had the power to pass laws generally for the punishment of crimes committed on these reservations, either by the Indians or by other persons. See *Worcester v. The State of Georgia*, 6 Peters, 515; *United States v. Holliday*, 3 Wall., 407; *United States v. Bailey*, 1 McLean, 234. In the last case it was held, that, under this power to regulate commerce with the Indian tribes, congress cannot exercise a general jurisdiction over an Indian territory within a state. See also *United States v. Cisna*, id., 254.

That, whilst the Indian reservations are within the limits of the United States, although within an organized territory of the United States, congress may assume a general jurisdiction over the reservations and the Indians thereon, when not prohibited by treaty stipulation, is affirmed in the case of *United States v. Bailey*, *supra*. On page 237 the court says: "But the act under consideration asserts a general jurisdiction for the punishment of offenses over the Indian territory, though it be within the limits of a state. To the exercise of this jurisdiction within a territorial government there can be no objection; but the case is wholly different as regards Indian territory within the limits of any state. In such case the power of congress is limited to the regulation of commercial intercourse with such tribes of Indians that exist as a distinct community, governed by their own laws, and resting for their protection

on the faith of the treaties and the laws of the Union. Beyond this the power of the federal government, in any of its departments, cannot be extended."

Under the territorial government of Wisconsin, it was not disputed but that the courts of the United States could punish a crime committed by a tribal Indian, even when committed upon the Indian territory. See *Mauzauwauneka v. The United States*, 1 Pin., 124. If the power to punish the Indians for crimes, whilst existing in tribes, was vested in the United States whilst they lived within the territories of the United States, then that power passed to the state when it was admitted to the Union (unless, as before stated, some treaty with the United States prevented the exercise of such jurisdiction), under the tenth amendment to the constitution of the United States, which provides that " the powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

There is, perhaps, some general language used by Justice Davis in his opinion in the case of *The Kansas Indians*, 5 Wall., 737, 755, which seems to be in conflict with the opinion above expressed; but this was a case simply involving the right of the state of Kansas to tax the lands of these Indians, and the only point decided was that the state had no right, under the treaties with these Indians, to tax their lands, and what was said outside of this question was *obiter*, and entitled only to that respectful consideration which the opinion of a learned and experienced judge demands of the court. The conclusion that Indian lands are not subject to taxation by the state, does not by any means prove that the Indians themselves may not be subject to its criminal laws.

The courts of the states of New York, North Carolina, Tennessee, Arkansas, Kansas, Alabama and Georgia, and the circuit court of the United States for the seventh and eighth circuits, hold that the states, unless prohibited by treaties made

with the United States, or by some reservation made in the act admitting the state into the Union, have jurisdiction to extend their criminal laws over the tribal Indians and their reservations situate within their boundaries. *United States v. Bailey* and *United States v. Cisna, supra; United States v. Sa-coo-da-cot*, 1 Abb. U. S. Cir. Ct. R., 377; *Goodell v. Jackson*, 20 Johns., 693; *Murray v. Wooden*, 17 Wend., 531; *Peters' Case*, 2 Johns. Cases, 344; *Clay v. State*, 4 Kansas, 49; *Hicks v. Ew-har-to-nah*, 21 Ark., 106; *People v. Antonio*, 27 Cal., 404; *United States v. Stahl*, 1 Woolworth C. C. R., 192; *State v. Foreman*, 8 Yerger, 256; *United States v. Rogers, supra; Caldwell v. State*, 1 Stewart & Porter, 327; *State v. Tassels*, Dudley (Ga.), 229; *State v. Ta-cha-na-tah*, 64 N. C., 614.

After the decision in the case of the *United States v. Bailey, supra*, in which the circuit court of the United States held that the United States courts had no authority to punish a crime committed within an Indian reservation situate within the boundaries of a state, unless such right had been reserved in the act admitting the state into the Union, or the jurisdiction of the state over such reservation had been expressly taken from the state at the time of its admission, congress, acknowledging the soundness of that decision, repealed the act of 1817, being chapter 92 of the laws of congress of that year (3 U. S. St. at Large, 383), which had attempted to confer the power upon the courts of the United States to punish for crimes committed in such reservations even when within the boundaries of a state. The first section of the repealed act read as follows: "If any Indian or other person or persons shall, within the United States and within any town, district or territory belonging to any nation or nations, tribe or tribes of Indians, commit any crime, offense or misdemeanor, which, if committed in any place or district of country under the sole and exclusive jurisdiction of the United States, would by the laws of the United States be punished with death or any other pun-

ishment, every such offender, on being thereof convicted, shall suffer the like punishment as is provided by the laws of the United States for the like offenses, if committed within any place or district of country under the sole and exclusive jurisdiction of the United States." The other sections of the act provided for the trial of all such offenses in the courts of the United States. This act was repealed June 30, 1834, shortly after the decision in Bailey's case, and congress then passed a general law regulating trade and intercourse with the Indian tribes; and the first section of that act defines what shall thereafter constitute and be deemed the Indian country. The definition is as follows: "All that part of the United States west of the Mississippi, and not within the states of Missouri and Louisiana, or the territory of Arkansas, and also that part of the United States east of the Mississippi river, and not within any state, to which the Indian title has not been extinguished." The twenty-fifth section of the act provides " that so much of the laws of the United States as provides for the punishment of crimes committed within any place within the sole and exclusive jurisdiction of the United States, shall be in force in the Indian country; provided, the same shall not extend to crimes committed by one Indian against the person or property of another Indian."

The laws above quoted show beyond all doubt that the United States had assumed the power to extend the criminal laws of the United States to all Indians living within its jurisdiction. The first act, of 1817, undertook to punish the Indians for crimes committed by them against the persons and property of Indians, as well as those against the persons and property of white persons; and the law of 1834 extended the jurisdiction to all crimes except those committed by one Indian against the person or property of another, and limited the jurisdiction to the Indian country as defined by that act, so as not to assert the power to punish for crimes committed on the Indian reservations lying within the boundaries of any

state. It follows that after the passage of the act of congress of 1834, upon the formation of any state out of the country designated in that act as the Indian country, and its admission into the Union on equal terms with the original states, the jurisdiction of the United States to punish for crimes committed upon the Indian reservations within such state would be lost, unless reserved by the act admitting such state into the Union. And the power to punish crimes after that, upon the reservations within the state, must be either vested in the state or remain with the tribes themselves. But the authorities above cited abundantly show that the power to punish crimes committed by these tribal Indians, whether committed within their reservations or in other places within the state, is vested in the state. The jurisdiction of the state, when not restricted by existing treaties made with the tribes, or by the act admitting the state into the Union, is supreme over the subject, and extends to all persons and places within the state.

The only other question necessary to consider is, whether the criminal laws of this state were intended to apply to the Indians living upon the reservations therein. Upon this point, we think, there can be no doubt; and, admitting the power to exist in the state, the learned counsel for the defendant hardly contends that they do not apply. The second section of the Revised Statutes of 1849 declared that the jurisdiction and sovereignty of the state should extend to all places within the boundaries thereof. The second section of the revision of 1858 is a reënactment of that section; and in the revision of 1878, it is made the first section thereof. This section clearly shows that all laws passed by the state are to have effect in all parts thereof, and upon all persons, unless the laws themselves are local or private.

As a strong ground of inference that Indians are included within the laws when not excepted from their provisions, we find that in several of the laws of a general nature, which it was intended should not extend to Indians, they are expressly

exempted from their provisions. The law for the assessment and collection of taxes exempts from taxation the property of all Indians not citizens, except lands held by them by purchase. The game laws generally except Indians. See section 4566, R. S. 1878, which expressly provides that certain game laws shall not "apply to tribal Indians on their reservations." The law defining who shall be electors expressly excludes tribal Indians. As evidence that the state intends its jurisdiction should extend to these tribal Indians, the legislature very early legislated upon the subject of selling or giving intoxicating liquors to Indians, or keeping for the purpose of selling or giving to them any intoxicating liquors at any place upon the land belonging to or occupied by them under treaty stipulation of the United States within this state. The same statute provides for the arrest of an Indian when found drunk, whether upon such Indian territory or not. See R. S. 1878, sections 1566–1569, inclusive, which are but reënactments of laws which were in existence here before the state was admitted into the Union, and have been continued to the present time.

We have no doubt that the criminal laws of the state apply to the Indians on their reservations within this state.

There can be no doubt of the jurisdiction of the circuit court for Brown county over the territory of the Oneida reservation. The reservation lies wholly within the boundaries of that county, as fixed by the laws of the state; and that court has, therefore, jurisdiction of all crimes committed within its borders.

We are of the opinion that the defendant was properly convicted.

*By the Court.* — The exceptions of the defendant are overruled, and the cause remanded with directions to the circuit court to proceed to judgment against the defendant.