## In re BLACKBIRD.

### (District Court, W. D. Wisconsin. June 6, 1901.)

#### No. 602.

INDIANS—STATE JURISDICTION OVER—GAME AND FISH LAWS.

The authorities of the state of Wisconsin have no jurisdiction to enforce the game and fish laws of the state against members of the Chippewa Indian tribe residing on the Bad River reservation by arresting and punishing them for acts committed on their reservation. By Act March 3, 1885 (23 Stat. 362, 385, § 9), congress prescribed what acts should constitute crimes when committed by tribal Indians on a reservation within a state, and by what courts they should be tried therefor, and the jurisdiction so conferred is exclusive, a state having no power to add to the number of crimes defined by such act, nor its courts any jurisdiction to try or punish an Indian for any act done on his reservation. Moreover, by the terms of the treaty of September 30, 1854, by which the Chippewas ceded their lands to the United States, and which reserved certain lands which were afterwards formed into the reservations now occupied by them, they were given the right to hunt and fish therein until otherwise ordered by the president.

On Application for Writ of Habeas Corpus.

William G. Wheeler and Henry T. Sheldon, U. S. Attys.

E. R. Hicks, Atty. Gen., for State of Wisconsin.

BUNN, District Judge.    John Blackbird, an Indian, and a member of the Chippewa tribe of Indians, situate and residing on the Bad River reservation, in the state of Wisconsin, on April 23, 1901, was arrested upon the said reservation by one Bert McLaughlin for setting a net for fish in Bear Trap creek, a small stream upon and mainly within said reservation.    His net was seized by the game warden, and he taken to Ashland, and tried in the municipal court, and convicted of fishing with a net, contrary to the fish and game laws of the state, and sentenced to pay a fine of $25, and costs, amounting to $11.75, and in default of payment was sentenced by the court to imprisonment at hard labor in the county jail of Ashland county for the term of 30 days.    This writ is sued out at the instance of the United States government to test the legality of his conviction and imprisonment.    .

The evidence showed that Blackbird was a full-blooded Indian, and a member of the Chippewa tribe of Indians residing on the Bad River reservation, lying up on Lake Superior, in Wisconsin, under the care of an Indian agent appointed by the United States; and the question is whether the fish and game laws of Wisconsin extend to the arrest and punishment of Indians maintaining their tribal relations and residing upon Indian reservations within the limits of the state.    It is, in short, the continuation of a controversy which should properly have ended with the decision of the United States supreme court in U. S. v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228.    Before that time there may have been some excuse for such decisions as that of the supreme court of Wisconsin in State v. Doxtater, 47 Wis. 278, 2 N. W. 439, where it was held that the criminal laws of this state apply to the Indians on their reservations within the state, and that the state circuit courts have jurisdiction of all crimes committed within the borders of the county of Brown, where the reservation was situated.    That decision was made in 1878, before the law of congress providing a code of criminal law for Indians so situated was passed.    In the case of Worcester v. Georgia, 6 Pet. 515, 8 L. Ed. 483, the supreme court of the United States had held that, though the Indians had, by treaty, sold their land within that state, and agreed to remove away, which they had failed to do, the state could not, while they remained on these lands, extend its laws, criminal and civil, over the tribes; that the duty and power to compel their removal was in the United States, and the tribe was under their protection, and not subjected to the laws of the state and the process of its courts.    By section 9, c. 341, Act Cong. March 3, 1885, congress provided as follows:

"That immediately upon and after the date of the passage of this act all Indians, committing against the person or property of another Indian or other person any of the following crimes, namely, murder, manslaughter, rape, assault with intent to kill, arson, burglary and larceny within any territory of the United States, and either within or without an Indian reservation, shall be subject therefor to the laws of such territory relative to said crimes, and shall be tried therefor in the same courts and in the

same manner and shall be subject to the same penalties as are all other persons charged with the commission of said crimes, respectively; and the said courts are hereby given jurisdiction in all such cases; and all such Indians committing any of the above crimes against the person or property of another Indian or other person within the boundaries of any state of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States."

The jurisdiction of congress to pass this act, and the jurisdiction of the United States courts under it, was fully considered and settled by the supreme court in U. S. v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228. Justice Miller, speaking for the court, gives the true ground for maintaining the criminal jurisdiction of the United States over the Indians thus:

"The statute itself contains no express limitation upon the powers of a state or the jurisdiction of its courts. If there be any limitation in either of these, it grows out of the implication arising from the fact that congress has defined a crime committed within the state, and made it punishable in the courts of the United States. But congress has done this, and can do it, with regard to all offenses relating to matters to which the federal authority extends. Does that authority extend to this case? It will be seen at once that the nature of the offense [murder] is one which in almost all cases of its commission is punishable by the laws of the states, and within the jurisdiction of their courts. The distinction is claimed to be that the offense under the statute is committed by an Indian, that it is committed on a reservation set apart within the state for residence of the tribe of Indians by the United States, and the fair inference is that the offending Indian shall belong to that or some other tribe. It does not interfere with the process of the state courts within the reservation, nor with the operation of state laws upon white people found there. Its effect is confined to the acts of an Indian of some tribe, of a criminal character, committed within the limits of the reservation. It seems to us that this is within the competency of congress. These Indian tribes are the wards of the nation. They are communities dependent on the United States; dependent largely for their daily food; dependent for their political rights. They owe no allegiance to the states, and receive from them no protection. Because of the local ill feeling, the people of the states where they are found are often their deadliest enemies. From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them, and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the executive and by congress, and by this court, whenever the question has arisen. The power of the general government over these remnants of a race once powerful, now weak, and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government because it never has existed anywhere else, because the theater of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes."

This case should and does settle the question by the highest judicial authority that, congress having taken jurisdiction of crimes committed by Indians within the limits of an Indian reservation, that jurisdiction is exclusive, and that the state laws do not extend to these cases.

The supreme court of Minnesota, in 1893, in State v. Campbell, 53 Minn. 354, 55 N. W. 553, 21 L. R. A. 169, states the true doc-

trine, and submits to the jurisdiction of the federal courts in these cases in the proper spirit. In an able and exhaustive opinion by Judge Mitchell, the court says:

"The late Justice Miller, speaking for the court, after pointing out that the right of congress to legislate for Indians in territories could be maintained merely upon the ownership and exclusive sovereignty of the United States in and over the country, then proceeds to consider the second clause of the statute, which legislates with reference to Indians within a state. After conceding, what is almost self-evident, that the clause in the constitution giving congress the power to regulate commerce with Indians would not give it power to enact a system of criminal laws for Indians having no relation to trade and intercourse with them, and suggesting that the statute does not interfere with the operation of state laws upon white people found within an Indian reservation, and that its effect is confined to acts of tribal Indians committed within the limits of the reservation, he holds that this legislation is within the competency of congress, not because the right to enact it has been reserved by some treaty, or by the act admitting a state into the Union, but upon the broad ground that Indians, while preserving their tribal relations, residing on a reservation set apart for them by the United States, are the wards of the general government, and under its protection, and as such are the subject of federal authority, over which congress has the same power to legislate within the states as over any other subject of federal jurisdiction. And, if they are thus under the control of congress, that control must be exclusive; for, as suggested in the case of the Kansas Indians, 5 Wall. 737, 18 L. Ed. 667, 'from necessity there can be no divided authority.' It would never do to have both the United States and the state legislating on the same subject. By the act of 1885, presumably, congress has enumerated all the acts which, in their judgment, ought to be made crimes when committed by Indians in view of their imperfect civilization. For the state to be allowed to supplement this by making every act a crime on their part which would be such if committed by a member of our more highly civilized society would be not only inappropriate, but also practically to arrogate the guardianship over those Indians, which is exclusively vested in the general government. Moreover, it is very evident that the state never intended to attempt to extend its criminal laws over tribal Indians for acts committed within a reservation. See Gen. St. 1878, c. 25, § 1, and Pen. Code, § 539. The exception among the decisions of the state courts on the subject to which we have heretofore alluded is the very exhaustive and able opinion in State v. Doxtater, 47 Wis. 278, 2 N. W. 439. But, with all due deference to that eminent court, it seems to us that they have not given due weight to the fact that the jurisdiction of the federal government over these Indian tribes rests, not upon the ownership of and sovereignty over the country in which they reside, but upon the fact that, as the wards of the general government, they are the subjects of federal authority within the states as well as within the territories,—a doctrine which the supreme court of the United States has developed and announced in the case of U. S. v. Kagama, supra, much more distinctly than in any deliverance extant when State v. Doxtater was under consideration, some fourteen years ago."

In that case, as in the Case of Doxtater, supra, decided by the supreme court of Wisconsin, the crime of which the state assumed to have jurisdiction over the Indians was that of adultery, which the United States statute above quoted gives no jurisdiction to punish. This was also the case Ex parte Mayfield, 141 U. S. 107, 11 Sup. Ct. 939, 35 L. Ed. 635, where the supreme court held that a member of the Cherokee nation committing adultery with an unmarried woman within the limits of its territory is amenable only to the courts of the Indian nation. In this last case the defendant was

tried and convicted in the United States district court for the Western district of Arkansas, and sentenced to the Detroit House of Correction for three years. He was taken from confinement on habeas corpus and set at liberty on the ground that the Cherokee nation only had jurisdiction, although it was altogether probable that by the Indian law, as by the common law, adultery was not a criminal offense. This case has no decisive bearing on the question in the case at bar, because the prosecution was in the United States court, and no claim of jurisdiction was made under state laws. It is only significant in holding that the defendant was amenable only to the courts of the Indian nation, without any suggestion of state authority over the subject. The true and unimpeachable ground of federal jurisdiction in such a case as this is that the Indians placed upon these reservations in the states are the wards of the government, and under its tutelage and superintendence, and that, congress having assumed jurisdiction to punish for criminal offenses, that jurisdiction is exclusive. As was said by the supreme court in the Kansas Indians, 5 Wall. 737, 18 L. Ed. 667, "From necessity there can be no divided authority." The lands from which this and other Indian reservations were formed on the shores of Lake Superior originally belonged to the Indians from time immemorial. They were found there; and, while the government claimed the abstract title to the lands, it always recognized a possessory right on the part of the Indians, which could not be taken away except by treaty. And in this way all the Indian lands have been obtained. At an early time in our history the government began making treaties with the Indian tribes, and has continued it to the present time. No other authority can make treaties with them. These lands in Wisconsin along Lake Superior from the St. Louis river east to Michigan, owned and occupied by the Chippewa Indians, including also lands in Minnesota west of the lake, were ceded by the Chippewas of Lake Superior and the Mississippi river to the United States by a treaty made at La Pointe, Wis., on September 30, 1854. Certain portions of these lands were reserved for the several reservations afterwards formed and set apart for the Indians in Northern Wisconsin. By article 11 of the treaty (10 Stat. 1111) it was stipulated that such Indians as then resided in the territory ceded should have the right to hunt and fish therein until otherwise ordered by the president. The Chippewa Indians have occupied these reservations under the superintendence and tutelage of the United States ever since. The government appoints an Indian agent and subagents, who have control and supervision of all the reservations in the state, and a government farmer for each reservation, with police powers, and who resides upon the reservation. Indian schools are established and maintained by the government. Allotments of land are allowed to the Indians, and annuities, and a general care and superintendence is given by the United States. Many other provisions of the criminal laws of the United States are made applicable by congress to the government of the Indians on these reservations. It is made a criminal offense, punishable by fine and imprisonment, to sell or give intoxicating liquor to Indians, or to take them into

the Indian country, or to set up a distillery thereon. Section 2142, Rev. St. U. S., provides that every white person who shall make an assault upon an Indian or other person, and every Indian who shall make an assault upon a white person, within the Indian country, with a gun, rifle, sword, knife, or any other deadly weapon, with intent to kill or maim the person so assaulted, shall be punishable by imprisonment at hard labor for not more than four years, nor less than one year. Section 2143 provides that every white person who shall set fire, or attempt to set fire, to any house, outhouse, cabin, stable, or other building, in the Indian country, to whomsoever belonging, and every Indian who shall set fire to any house, outhouse, cabin, stable, or other building in the Indian country, in whole or in part belonging to or in lawful possession of a white person, and whether the same be consumed or not, shall be punishable by imprisonment at hard labor for not more than 20 years nor less than 2 years. Section 2145 provides that, except as to crimes the punishment of which is expressly provided for in this title, the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country. Section 2147 provides that the superintendent of Indian affairs and the Indian agents and subagents shall have authority to remove from the Indian country all persons found therein contrary to law, and the president is authorized to direct the military force to be employed in such removal. Section 2149 provides that the commissioner of Indian affairs is authorized and required, with the approval of the secretary of the interior, to remove from any tribal reservation any person being therein without authority of law, or whose presence within the limits of the reservation may, in the judgment of the commissioner, be detrimental to the peace and welfare of the Indians. Various other provisions are made for the punishment of crime both by Indians and white persons upon the reservation. It will be thus seen that ample provision has been made by congress and by the departments for policing these reservations. It is quite evident that congress has made all the provision it deemed necessary for the proper government and control of the Indians. No doubt, if necessary, congress would provide for the punishment of lesser crimes committed by the Indians. But so far, with the superintendence that is guarantied, it has not been found necessary. Indeed, these Indians are a quiet, peaceable people, and all the trouble and infractions of the peace that have come among them have arisen from the mercenary acts of white men in selling them intoxicating drink in violation of law. Congress might even provide fish and game laws to restrict the Indians in their natural and immemorial rights of fishing and hunting. But it has not seen fit to do so. It would be intolerable if the state, under these circumstances, should have the power to step in, and extend its civil and criminal codes and police power over these people. It would be an invitation to an early conflict of jurisdiction. As was held in the Campbell Case, supra, decided by the supreme court of Minnesota:

"For the state to be allowed to supplement this by making every act a crime on their part which would be such if committed by a member of our more highly civilized society, would be not only inappropriate, but also practically to arrogate the guardianship over these Indians, which is exclusively vested in the general government. Moreover, it is evident that the state never intended to attempt to extend its criminal laws over tribal Indians under the care of the general government for acts committed within reservations."

After taking from them the great body of their lands in Minnesota and Wisconsin, allowing them to reserve certain portions for reservations, and stipulating that they should always have the right to fish and hunt upon all the lands so ceded, it would be adding insult as well as injustice now to deprive them of the poor privilege of fishing with a seine for suckers in a little red marsh-water stream upon their own reservation. It is well known that these fish cannot be taken with hook and line, but only by spears and nets. They are a fish that white men will hardly ever eat, though it is a matter of common knowledge that Indians prize them quite as highly as brook trout. These lands have from long time been their hunting and fishing ground. When an Indian cannot get a morsel of pork and white flour, a red horse or sucker from some stream where brook trout would never abide, boiled or roasted by a camp fire, is sometimes a luxury, to deprive him of which would be ungrateful in the extreme. I feel confident that neither the state nor congress ever meditated any such cruelty, and that the prisoner's arrest was the result of overzeal on the part of a fish and game warden, which may be excusable, but is not justifiable in law. The prisoner will be released.