## STATE v. ROBERT JACKSON.[1]

No. 33,825.

November 10, 1944.

[1]Reported in 16 N. W. (2d) 752.

430

*Edward L. Rogers,* for appellant.

*J. A. A. Burnquist,* Attorney General, *Ralph A. Stone,* Assistant Attorney General, *Mandt Torrison,* Special Assistant Attorney General, and *W. B. Taylor,* Acting Itasca County Attorney, for the State.

STREISSGUTH, JUSTICE.

Defendant is a member of the Minnesota Chippewa tribe of Indians, enrolled as such with the Indian office at Cass Lake and with the United States Bureau of Indian Affairs. He resides with his family upon his mother's trust allotment in Beltrami county within the limits of the Leech Lake Indian Reservation, and has no allotment of his own. In May 1943, he visited the home of his wife's grandmother, who lived in Itasca county, within the boundaries of the same reservation, upon an allotment held in trust by the United States government for the grandmother's deceased husband, John Hunter, and his heirs. While on the Hunter allotment, defendant, with Mrs. Hunter's permission, shot three partridges to provide a meal for the family group. He was convicted of taking partridge in closed season in violation of the state game laws, and appeals from an order denying his motion for a new trial.

The Hunter allotment is in one of the organized townships of Itasca county and is part of the lands ceded to the United States under the Act of January 14, 1889 (25 Stat. 642), commonly known as the Nelson Act. The allotment to Hunter was made on November 19, 1900, under the general allotment act of 1887, as amended (24 Stat. 388, 26 Stat. 794, 36 Stat. 859, 25 USCA, c. 9), under which a patent was issued to individual allottees to be held in trust for them for 25 years, during which time the land could not be alienated or encumbered. In Hunter's case, the trust period had been extended from year to year by Presidential Order until 1934, when, by Act of June 18, 1934 (48 Stat. 984, 25 USCA, § 461, *et seq.*), the period was indefinitely extended.

The question presented by these stipulated and admitted facts is whether a tribal Indian can be prosecuted by the state for shooting game out of season for consumption by himself and family where the shooting occurs within the limits of the reservation of his tribe, upon ceded lands, not allotted to or occupied by him, but allotted to a deceased Indian of the same tribe, no fee-simple patent having been issued to the latter or his heirs.

The state bases its argument in support of the affirmative of this proposition mainly upon the premise that an Indian cannot assert personal immunity from state prosecution unless such immunity is expressly extended by treaty or federal statute. But the premise is false. The fallacy arises out of a failure to distinguish between jurisdiction over members of Indian tribes and jurisdiction over other persons in Indian country. The jurisdiction of the state, it is true, does extend over Indian country within its borders except as limited by Indian treaties or federal laws (State v. Cloud, 179 Minn. 180, 228 N. W. 611); and the right of state courts to prosecute white persons or nontribal Indians for crimes committed upon Indian reservations is uniformly upheld (United States v. McBratney, 104 U. S. 621, 26 L. ed. 869; Draper v. United States, 164 U. S. 240, 17 S. Ct. 107, 41 L. ed. 419; State v. Campbell, 53 Minn. 354, 55 N. W. 553, 21 L. R. A. 169), except where the offense is committed against a tribal Indian (Donnelly v. United States, 228 U. S. 243, 33 S. Ct. 449, 57 L. ed. 820, Ann. Cas. 1913E, 710, rehearing denied [1913], 228 U. S. 708, 33 S. Ct. 1024, 57 L. ed. 1035, Ann. Cas. 1913E, 710). But it is as uniformly held that, absent a treaty or federal statute conferring it, a state's jurisdiction does not extend over the individual members of an Indian tribe maintaining their tribal relations and organization upon a reservation within the geographical limits of the state. Such tribes are domestic, dependent communities under the guardianship, protection, and exclusive jurisdiction of the federal government, with the power of regulating their own internal and social relations, except as otherwise directed by congress. 27 Am. Jur., Indians, § 42, et seq.; Cherokee Nation v. Georgia, 5 Pet. 1, 8 L. ed. 25; Worcester v.

Georgia, 6 Pet. 515, 536, 8 L. ed. 483, 492; United States v. Kagama, 118 U. S. 375, 6 S. Ct. 1109, 30 L. ed. 228; Ex parte Crow Dog, 109 U. S. 556, 3 S. Ct. 396, 27 L. ed. 1030; Tulee v. Washington, 315 U. S. 681, 62 S. Ct. 862, 86 L. ed. 1115; In re Blackbird (D. C.) 109 F. 139; State v. Campbell, 53 Minn. 354, 55 N. W. 553, 21 L. R. A. 169; 39 Yale L. J. 307, "The Indian Problem and the Law." "Congress alone has the right to determine the manner in which this country's guardianship over the Indians shall be carried out." United States v. McGowan, 302 U. S. 535, 538, 58 S. Ct. 286, 287, 82 L. ed. 410, 412. "The power of the state must yield to the paramount authority of the Federal government." People ex rel. Cusick v. Daly, 212 N. Y. 183, 197, 105 N. E. 1048, 1052, Ann. Cas. 1915D, 367. "From necessity there can be no divided authority." The Kansas Indians, 5 Wall. 737, 755, 18 L. ed. 667; State v. Campbell, 53 Minn. 354, 55 N. W. 553, 21 L. R. A. 169, *supra.*

The admission of a state into the Union, even without an express reservation by congress of governmental jurisdiction over the public lands within its borders, does not qualify the former federal jurisdiction over tribal Indians so as to withdraw from the United States authority to punish crimes committed by or against Indians on an Indian reservation (Donnelly v. United States, *supra*), or so as to make tribal Indians amenable to state laws for crimes committed on their reservation. United States v. Kagama, *supra;* 27 Am. Jur., Indians, § 47. Whatever rights a state acquires by its Enabling Act are subordinate to the Indians' prior right of occupancy. United States v. Thomas, 151 U. S. 577, 583, 14 S. Ct. 426, 428, 38 L. ed. 276, 278; Tulee v. Washington, 315 U. S. 681, 62 S. Ct. 862, 86 L. ed. 1115; State v. Cooney, 77 Minn. 518, 80 N. W. 696.

So far as treaty provisions are concerned, it is conceded that the treaty whereby the Leech Lake Reservation was established (Treaty of February 22, 1855, 10 Stat. 1165, Revision of Indian Treaties, p. 263) contains no express reservation by the Indians of the right to hunt and fish upon their reservation. But such saving clause would have been superfluous, as "the treaty was not a grant of rights to the Indians, but a grant of rights from them—a reserva-

tion of those not granted." The ancient and immemorial right to hunt and fish, which was "not much less necessary to the existence of the Indians than the atmosphere they breathed," remained in them unless granted away. United States v. Winans, 198 U. S. 371, 381, 25 S. Ct. 662, 664, 49 L. ed. 1089, 1092; and see, State v. Cooney, 77 Minn. 518, 80 N. W. 696, *supra;* State v. Johnson, 212 Wis. 301, 249 N. W. 284. At the time the Treaty of 1855 was made, the present Leech Lake Reservation was part of the "Indian country," so called, "subject to the occupancy of the Indians, with all the rights such occupancy gave. The object of the treaty was to limit the occupancy to certain lands and to define rights outside of them." United States v. Winans, 198 U. S. 379, 25 S. Ct. 663, 49 L. ed. 1091, *supra.*

The traditional right of Indians to hunt in the Indian country was recognized by congress as early as 1834. In that year congress enacted a law regulating trade and intercourse with Indian tribes (Act of June 30, 1834, c. 161, § 8, 4 Stat. 730), reframed in the Revised Statutes, and still on the statute books, which included a provision now reading as follows:

"Every person, *other than an Indian,* who, within the limits of any tribe with whom the United States has existing treaties, hunts, or traps, or takes and destroys any peltries or game, except for subsistence in the Indian country, shall forfeit all the traps, guns, and ammunition in his possession, used or procured to be used for that purpose, and all peltries so taken; and shall be liable in addition to a penalty of five hundred dollars." R. S. § 2137, 25 USCA, § 216. (Italics supplied.)

By expressly limiting the offense thereby created to persons other than Indians, this statute impliedly excluded Indians. 2 Lewis's Sutherland, Statutory Construction (2 ed.) § 491; Horack's Sutherland, Statutory Construction, § 4915; Cohen v. Gould, 177 Minn. 398, 405, 225 N. W. 435, 438.

Article VII of the 1855 treaty expressly provides:

"The laws which have been or may be enacted by Congress, reg-

ulating trade and intercourse with the Indian tribes, to continue and be in force within and upon the several reservations provided for herein \* \* \*." 10 Stat. 1169.

If express treaty or statutory authorization be necessary to establish the Chippewa's right to hunt upon their reservation, Article VII read in conjunction with the Act of 1834, as amended, provides the necessary recognition and authority. And, unless it be held that the trust allotment here involved was not "Indian country" within the meaning of the act of congress, the right of Chippewa tribal Indians to hunt upon any allotted lands "within and upon the several reservations" provided for by the treaty would seem to follow.

The state attempts to by-pass the quoted provisions of the 1834 act and the 1855 treaty by asserting that trust allotments such as here involved cannot be considered as being "Indian country" within the meaning of the act, § 1 of which limited "Indian country" to specifically named territory (including what is now Minnesota), "to which the Indian title has not been extinguished." Were such definition still in the act, the correctness of the state's position might be conceded. But congress, in enacting the Revised Statutes, failed to include such section, thereby repealing it. R. S. § 5596; Donnelly v. United States, 228 U. S. 243, 268, 33 S. Ct. 449, 458, 57 L. ed. 820, 831, Ann. Cas. 1913E, 710. We are therefore without a statutory definition of "Indian country" and must look for our definition in the decisions of the United States Supreme Court, the question being a federal one.

The Supreme Court of the United States, notwithstanding the repeal of § 1 of the 1834 act, continued for many years to use and apply the old statutory definition. Bates v. Clark, 95 U. S. 204, 24 L. ed. 471; Ex parte Crow Dog, 109 U. S. 556, 3 S. Ct. 396, 27 L. ed. 1030; United States v. Le Bris, 121 U. S. 278, 7 S. Ct. 894, 30 L. ed. 946; Clairmont v. United States, 225 U. S. 551, 32 S. Ct. 787, 56 L. ed. 1201. Then, in Donnelly v. United States, 228 U. S. 243, 269, 33 S. Ct. 449, 458, 57 L. ed. 820, 831, Ann. Cas. 1913E, 710, *supra,* decided in 1913, the court, recognizing "the changes which

have taken place," announced that the term "Indian country" could no longer "be confined to land formerly held by the Indians, and to which their title remains unextinguished," and that "nothing can more appropriately be deemed 'Indian country,' within the meaning of those provisions of the Revised Statutes that relate to the regulation of the Indians and the government of the Indian country, than a tract of land that, being a part of the public domain, is lawfully set apart as an Indian reservation." Later, in the case of United States v. Pelican, 232 U. S. 442, 449, 34 S. Ct. 396, 399, 58 L. ed. 676, 679, the court held that trust allotments retain, during the trust period, a distinctively Indian character, being devoted to "Indian occupancy under the limitations imposed by Federal legislation," and that such allotments are embraced within the term "Indian country" and, therefore, under the exclusive jurisdiction and control of congress.

The Donnelly and Pelican decisions have been repeatedly followed and applied, and, in fact, extended. United States v. Nice, 241 U. S. 591, 36 S. Ct. 696, 60 L. ed. 1192; United States v. Ramsey, 271 U. S. 467, 46 S. Ct. 559, 70 L. ed. 1039; Ex parte Van Moore (D. C.) 221 F. 954; In re Lincoln (D. C.) 129 F. 247; Yohyowan v. Luce (D. C.) 291 F. 425; State v. Cloud, 179 Minn. 180, 228 N. W. 611; Cohen, "Handbook of Federal Indian Law," pp. 5-8; 25 USCA, § 217, note 11; 27 Am. Jur., Indians, § 45. Only recently the Supreme Court held that "Indian country" comprises lands whereever situated which have been set apart for use and occupancy by Indians, even though not acquired from them. United States v. McGowan, 302 U. S. 535, 58 S. Ct. 286, 82 L. ed. 410.

It is, therefore, definitely established that the allotment here involved was Indian country within the meaning of R. S. § 2137, 25 USCA, § 216, and that defendant had a right to hunt thereon in disregard of state laws, unless for reasons we shall next consider.

In 1885, congress enacted what was originally known as the Seven Crimes Act (Act of March 3, 1885, c. 341, § 9, 23 Stat. 362, 385), and what, by reason of subsequent amendments, is now known as the Ten Crimes Act (Act of March 4, 1909, c. 321, § 328, 35

Stat. 1151, as amended by Act of June 28, 1932, c. 284, 47 Stat. 337, U. S. Crim. Code, § 328, 18 USCA, § 548). These acts provided that all Indians committing against the person or property of another Indian or other person any of the major crimes therein enumerated on any Indian reservation "shall be subject to the same laws, tried in the same courts, and in the same manner, and be subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States." (For history of these acts, see, United States v. Kagama, 118 U. S. 375, 6 S. Ct. 1109, 30 L. ed. 228, where constitutionality was upheld.) The acts did not have the effect of extending to the states the power to subject Indians within a reservation to the state criminal laws defining misdemeanors or felonies not enumerated in the federal acts. United States v. Quiver, 241 U. S. 602, 36 S. Ct. 699, 60 L. ed. 1196; Application of Konaha (7 Cir.) 131 F. (2d) 737; In re Blackbird (D. C.) 109 F. 139 (game and fish laws); State v. Campbell, 53 Minn. 354, 55 N. W. 553, 21 L. R. A. 169, *supra;* State v. Big Sheep, 75 Mont. 219, 243 P. 1067 (narcotic laws); State v. Rufus, 205 Wis. 317, 237 N. W. 67, overruling State v. Doxtater, 47 Wis. 278, 2 N. W. 439; People ex rel. Cusick v. Daly, 212 N. Y. 183, 105 N. E. 1048, Ann. Cas. 1915D, 367.

The fact situation in the case before us differs from that in State v. Cloud, 179 Minn. 180, 228 N. W. 611, only in that Cloud had engaged in his traditional recreation upon his own allotment, whereas defendant here had no allotment of his own but wandered upon the allotment of another Indian within the limits of the same reservation. This distinction, the state urges, is decisive, in view of the proviso in the allotment act (34 Stat. 182, c. 2348; 25 USCA, § 349) that "until the issuance of fee-simple patents all allottees to whom trust patents shall hereafter be issued shall be subject to the exclusive jurisdiction of the United States." This language, the state argues, "makes the jurisdiction of the United States dependent upon the issuance of a trust patent to the Indian in question." Such argument overlooks the fact that lands which are allotted to individual Indians by trust patents retain "a distinctively Indian

character" and remain Indian country within the purview of the federal laws during the entire trust period (United States v. Pelican, 232 U. S. 442, 449, 34 S. Ct. 396, 399, 58 L. ed. 676, 679; and see discussion of "Indian country," *supra*), and that all tribal Indians living upon the reservation remain wards of the federal government, notwithstanding they have been made citizens and regardless of whether they have received trust allotments, so long as such allotments have not ripened into a fee-simple title. (State v. Cloud and United States v. Pelican, *supra;* United States v. Celestine, 215 U. S. 278, 30 S. Ct. 93, 54 L. ed. 195; State v. Big Sheep, 75 Mont. 219, 243 P. 1067; State v. Phelps, 93 Mont. 277, 19 P. [2d] 319.) The effect of the proviso in the statute is not to change, but to preserve, the status of allottees as tribal Indians "until the issuance of fee-simple patents." And if tribal Indians to whom trust patents have been issued remain wards of the federal government, accountable only to it and to their tribe for acts committed anywhere on their reservation, not because they have allotments, but because they are tribal Indians, clearly a tribal Indian without an allotment has an equal immunity.

It follows that the fact that defendant had no allotment of his own did not defeat his right to claim immunity from prosecution under the state laws for shooting game upon the trust allotment of another Indian within the limits of his reservation. If the laws of the state are to be extended, in part or in whole, to tribal Indians upon their reservations, it must be by statutory definition of the term "Indian country" restricting its present meaning, or by a special act such as congress recently enacted to apply to the state of Kansas. See, Act of June 8, 1940, 54 Stat. 249, 25 USCA, § 217a.

Reversed.

UPON APPLICATION FOR REARGUMENT.

On December 15, 1944, the following opinion was filed:

STREISSGUTH, JUSTICE.

The authorities cited in the original opinion furnish adequate answers to all questions raised in the state's application for reargu-

ment. Further discussion is added only because of the state's insistence that we overlooked certain language of the Nelson Act (25 Stat. 642, Act of January 14, 1889, c. 24), providing for the cession and relinquishment by the Chippewa Indians of their title and interest in all reservations in the state except the White Earth and Red Lake Reservations.

The language called to our attention is in § 1 of the act:

"* * * the acceptance and approval of such cession and relinquishment by the President of the United States * * * shall operate as a complete extinguishment of the Indian title without any other or further act or ceremony whatsoever for the purposes and upon the terms in this act provided."

This is followed by provisions in § 3 for the removal of the Indians from Leech Lake and other reservations to the White Earth Reservation, with this important proviso, which the state has either overlooked or disregarded, though here decisive:

"* * * That any of the Indians residing on any of said reservations may, in his discretion, take his allotment in severalty under this act on the reservation where he lives at the time of the removal herein provided for is effected, instead of being removed to and taking such allotment on White Earth Reservation."

The lands here involved were allotted to John Hunter in conformity to allotment act of 1887, *infra,* as amended, under the express authority of the quoted proviso from the Nelson Act, and, under the decision in United States v. Pelican, 232 U. S. 442, 449, 34 S. Ct. 396, 399, 58 L. ed. 676, 679, and other cases cited in our original opinion, remained "Indian country" under the exclusive jurisdiction of the federal government.

The act of congress under consideration in the Pelican case (27 Stat. 62, Act of July 1, 1892, c. 140) related to the opening of a part of the Colville Indian Reservation in the state of Washington. The act provided that, "subject to the reservations and allotment of lands in severalty to the individual members of the Indians of the Colville Reservation," the portions of the reservation de-

scribed in the act were "vacated and restored to the public domain." In commenting upon the act, the court said (232 U. S. 446, 34 S. Ct. 397, 398, 58 L. ed. 678):

"* * * The exceptions were made by Congress in order to care for the Indians residing on that portion of the reservation. Every such Indian was entitled to select therefrom eighty acres which was to be allotted to the Indian in severalty (§ 4). The titles to the lands selected were to 'be held in trust for the benefit of the allottees, respectively, and afterwards conveyed in fee simple to the allottees or their heirs,' " as provided in the Acts of February 8, 1887 (24 Stat. 388, c. 119), and February 28, 1891 (26 Stat. 794, c. 383).

"*The evident purpose of Congress was to carve out of the portion of the reservation restored to the public domain the lands to be allotted and reserved, as stated, and to make the restoration effective only as to the residue.*" (Italics supplied.)

By parity of reasoning, the "complete extinguishment of the Indian title," referred to in the Nelson Act, was "effective only as to the residue" of the Leech Lake Reservation remaining after the Indians residing thereon had taken their allotments in severalty. And, as held in the Pelican case (232 U. S. 447, 34 S. Ct. 398, 58 L. ed. 678), all lands allotted in severalty and held in trust for the Indians "continued to be under the jurisdiction and control of Congress for all governmental purposes, relating to the guardianship and protection of the Indians, * * *."

State v. Bush, 195 Minn. 413, 419, 263 N. W. 300, 303, upon which the state still relies, is clearly distinguishable, because, as stated in that opinion, "Bush had received his patent in fee at the time of the commission of the misdemeanor" with which he was charged.

We pointed out in our original decision that we were confronted with a federal question upon which the federal decisions were controlling and suggested to the state a possible solution of the problems involved. We repeat again the language of Mr. Justice Black

440

in United States v. McGowan, 302 U. S. 535, 538, 58 S. Ct. 286, 287, 82 L. ed. 410, 412:

"* * * Congress alone has the right to determine the manner in which this country's guardianship over the Indians shall be carried out."

Application denied.

Mr. Justice Magney took no part in the consideration or decision of this case.