STATE of Minnesota, Respondent,

v.

C. John FORGE, Jr., Appellant,

James Olson and Richard C. Larsen, Appellants.

Nos. 46473, 46478 and 46479.

Supreme Court of Minnesota.

Oct. 14, 1977.

Hencke & Forge and C. John Forge, Jr. pro se, Independence, Mo., for Forge, Jr.

Donnelly & Martin and John H. Martin, St. Paul, for Olson and Larsen.

Warren Spannaus, Atty. Gen., C. Paul Faraci, Deputy Atty. Gen., Steven G. Thorne, Special Asst. Atty. Gen., St. Paul, John L. Plattner, County Atty., Walker, for respondent.

Smith, Juster & Feikema and Allen H. Gibas, Minneapolis, for Crane Clan of the Lake Superior Chippewa Band seeking reversal.

Tupper, Smith & Seck, Kent P. Tupper, Bernard P. Becker, and Kim D. Mattson, Walker, for Leech Lake Band of Chippewa Indians seeking affirmance.

Peter R. Taft, Asst. Atty. Gen., Edmund B. Clark, George R. Hyde, Edward J. Shawaker, Dept. of Justice, Washington, D. C., for the United States, seeking affirmance.

ROGOSHESKE, Justice.

On this appeal, defendants seek to overturn their convictions for fishing on the Leech Lake Indian Reservation without a supplementary reservation stamp affixed to their Minnesota fishing licenses in violation of Minn.St. 97.431. Defendants principally contend that this statute, which requires all persons who are not members of the Minnesota Chippewa Tribe to pay a special licensing fee for the privilege of fishing within the reservation, is an unconstitutional denial of equal protection to non-Indians. For reasons which follow, we hold that members of the Minnesota Chippewa Tribe retain unextinguished treaty rights to fish on Leech Lake and that § 97.431 is a rational compromise between these rights and the legitimate interest of the State of Minnesota to regulate fishing within its borders. We therefore hold that § 97.431 has not denied defendants equal protection under the law and affirm their convictions.

On June 22, 1973, defendants C. John Forge, Jr., James Olson, and Richard C. Larsen fished at Leech Lake with valid fishing licenses issued by the State of Minnesota for the year 1973 but without the Leech Lake Reservation stamp affixed thereto.[1] None of the defendants were members of the Minnesota Chippewa Tribe, and all of them knew that it was a violation of § 97.431 to fish at Leech Lake without the reservation stamp. Defendants were arrested by a state conservation officer and subsequently were found guilty of fishing illegally by the County Court of Cass County on August 3, 1973. An appeal was taken to the Cass County District Court in which defendants' convictions were affirmed on November 7, 1975.

Underlying these relatively simple facts is a long and acrimonious history of litigation concerning fishing and hunting rights in the Leech Lake area. In 1969, the Leech Lake Band of Chippewa Indians (hereinafter Band) brought suit in Federal District Court against the commissioner of natural resources of the State of Minnesota, seeking a declaratory judgment that the Band had an unextinguished and exclusive treaty right to hunt, fish, trap, and gather wild rice within the boundaries of the Leech Lake Reservation and that they could exercise that right free of state control. A similar suit, which was basically sympathetic to the claims made by the Band, was subsequently brought by the United States government on behalf of the entire Minnesota Chippewa Tribe[2] and was joined with the former actions. These consolidated cases generated widespread public concern, for it was commonly believed by non-Indian sportsmen and resort owners in the Leech Lake area that, if the Indians had an exclusive right to fish in Leech Lake, the valuable fishing resources could become depleted through commercial exploitation, resulting in disastrous consequences to the tourist industry. After vigorous and protracted litigation, the Federal District Court determined that the Band had an unextinguished but nonexclusive treaty right to take fish from Leech Lake free of state regulation. This conclusion was predicated on the finding that the Chippewa Indians had entered into treaties with the United States government in 1855 and 1867 reserving to themselves the rights to hunt, fish, trap, and gather wild rice upon the public lands and waters of the reservation. Contrary to the claims made by the state, the Federal District Court further held that the Nelson Act of 1889, 25 Stat. 642,[3] had not disestablished the Leech Lake Reservation, and as a consequence, the Band's reserved treaty rights

1. The Leech Lake Reservation covers an area of 588,684 acres and is located within Itasca, Cass, and Beltrami Counties. Approximately 80 percent of this land is now owned by Federal, state, and county governments, with the 295,000-acre Chippewa National Forest occupying the largest single portion of the reservation. Approximately 27,000 acres of the remaining area is owned either by individual Indians in fee or the Minnesota Chippewa Tribe.

2. The Minnesota Chippewa Tribe is a Federally constructed Indian tribe organized under the Wheeler-Howard Act of 1934, 25 U.S.C.A. § 461 et seq. This tribe is the aggregate of certain of the historic Chippewa bands, including the Leech Lake Band.

3. See, I Kappler, Laws and Treaties, p. 301.

had not been abrogated. See, *Leech Lake Band of Chippewa Indians v. Herbst*, 334 F.Supp. 1001 (D.Minn.1971), (hereinafter referred to as Leech Lake I).

Following the Leech Lake I decision, the parties appealed and cross-appealed on the issue of the Band's alleged exclusive right to regulate fishing independent of state control in Leech Lake. At that stage of the litigation, a group called the Leech Lake Citizens Committee, represented principally by present-defendant C. John Forge, filed a motion with the Eighth Circuit Court of Appeals seeking to intervene on behalf of private non-Indian sportsmen and property owners in the lake area. Although this motion was denied, the court did grant the Leech Lake Citizens Committee permission to file a brief amicus curiae.[4]

While the Eighth Circuit appeal was still pending, the parties and the governor of Minnesota entered into a tentative settlement agreement on January 26, 1973. On this basis, the Eighth Circuit remanded the matter to the Federal District Court for entry of a consent judgment. Under the major terms of this agreement, members of the Minnesota Chippewa Tribe were exempted from state regulation within the reservation as to fishing, hunting, trapping, and the gathering of wild rice. The Band agreed to prohibit commercial hunting and fishing so as to conserve these resources for the tourist industry and to regulate the fishing activities of its members according

to the provisions of its own tribal conservation code.[5] In return, the state agreed to collect for the benefit of the Band a supplementary licensing fee from non-Indians for the right to hunt, trap, and fish in this area. An established committee comprised of members of the Band was given the right to determine the amount of the supplementary fee, provided that it did not exceed one-half the sum charged by the state for hunting, trapping, and fishing licenses. The settlement reached by the parties was "expressly conditioned upon the adoption by the Legislature, at the 1973 session thereof, of legislation to be submitted by the Governor to effectuate the terms of [the] Agreement." [6]

After extensive hearings were conducted, in which Forge and other interested citizens participated, Minn.St. 97.431 was finally enacted into law on April 23, 1973. Subdivision 3 of this statute expressly ratified the previously executed settlement agreement, and subd. 4 authorized the commissioner of natural resources to set up the administrative machinery needed for collection of the special licensing fee.[7] On June 18, 1973, the Federal District Court incorporated the settlement agreement into a consent judgment, which effectively terminated the Leech Lake I litigation.[8]

According to the terms of § 97.431, the special licensing requirements for fishing in Leech Lake became effective on June 22, 1973,[9] and not coincidentally, defendants

---

4. This sequence of events is more fully described in *Leech Lake Citizens Committee v. Leech Lake Band of Chippewa Indians*, 355 F.Supp. 697 (D.Minn.1973).

5. The tribal conservation code is in most respects similar to the state fish and game laws.

6. During the time that the settlement negotiations and legislative hearings were taking place, the Leech Lake Citizens Committee attempted to enjoin the proceedings by bringing an action in Federal District Court. On March 28, 1973, the court dismissed the action, finding that the court was "without authority to enjoin the Legislature from ratifying the agreement." *Leech Lake Citizens Committee v. Leech Lake Band of Chippewa Indians*, 355 F.Supp. 697, 699 (D.Minn.1973).

7. Since the inception of the special licensing fee agreement, the Band has never charged more than $1 for the reservation stamp, which is substantially less than one-half the sum charged by the state for hunting and fishing licenses.

8. Prior to entry of the consent judgment, another attempt was made by Forge and other members of the Leech Lake Citizens Committee to intervene in the Leech Lake I lawsuit. This motion was denied by the Federal District Court and summarily affirmed by the Eighth Circuit in *Leech Lake Area Citizens Committee v. Leech Lake Band of Chippewa Indians*, 486 F.2d 888 (8 Cir. 1973).

9. See, L.1973, c. 124, § 2.

were arrested on the same date. Both defendants and the trial judge viewed the prosecution from the start as a test case challenging the constitutionality of § 97.-431. Notwithstanding the express holding in Leech Lake I, which found that the Nelson Act had not extinguished the Band's treaty rights, the trial judge painstakingly reconsidered the congressional history and intent behind this act. Based upon this analysis, the trial court concluded that the Nelson Act had completely terminated the Leech Lake Reservation, with the result that any treaty rights claimed by the Band to hunt, fish, trap, and gather wild rice were nonexistent. It necessarily followed, in the opinion of the trial judge, that § 97.431 denied defendants equal protection of the law. For the sole purpose of permitting the present appeal to this court, the district court affirmed defendants' convictions entered by the county court.

Defendants assert as their principal claim that § 97.431 denies non-Indians equal protection under both the Fourteenth Amendment and Minn.Const. art. 1, § 2, since the statute exempts all members of the Minnesota Chippewa Tribe from paying a special licensing fee and further provides that the monies collected for the special fee by the state are to be paid to the Band.[10] Closely related to this argument is the claim that § 97.431 is special legislation prohibited by Minn.Const. art. 4, § 33.[11] As correctly observed by the trial judge, the merit of these allegations hinges directly on whether the Band retains unextinguished treaty rights to fish in Leech Lake and whether these rights, if found to exist, were terminated by the Nelson Act.

Prior to passage of the Nelson Act, two significant treaties were negotiated with the Chippewa Indians which in large part established the boundaries of what is now known as the Leech Lake Reservation. In the Treaty of February 22, 1855, 10 Stat. 1165,[12] the Chippewa agreed to "cede, sell, and convey to the United States all their right, title, and interest in, and to, the lands now owned and claimed by them, in the Territory of Minnesota." By this treaty and the Treaty of March 19, 1867, 16 Stat. 719,[13] the Indians were granted in return a number of reservations, one of which was the Leech Lake Reservation.[14] Under these treaties the Band retained an unextinguished right to hunt and fish, as the trial court expressly found.[15]

---

**10.** In an amicus brief filed by the Crane Clan, it is argued that § 97.431 also denies Chippewa Indians who are not members of the Minnesota Chippewa Tribe as well as members of other tribes equal protection of the law. The Crane Clan is one of 27 clans that originally constituted the historic Chippewa Tribe. Not all of these clans, however, comprise the Federally constructed Minnesota Chippewa Tribe, which was recognized under the Wheeler-Howard Act of 1934. See, footnote 2, *supra*. We decline to consider this issue on the present appeal, since the entire thrust of the trial court proceedings was directed to the constitutionality of § 97.431 with respect to non-Indians.

**11.** Under the restructured constitution, enacted subsequent to defendants' prosecutions, the special legislation prohibitions are contained in Minn.Const. art. 12, § 1.

**12.** See, II Kappler, Laws and Treaties, p. 685.

**13.** Id. 974.

**14.** Other less significant treaties and executive orders during this period were: Treaty of March 11, 1863, 12 Stat. 1249; Treaty of May 7, 1864, 13 Stat. 693; and executive orders of November 4, 1873, October 29, 1873, and May 26, 1874 (I Kappler, Laws and Treaties, pp. 851, 854).

**15.** Defendants have attempted both in their reply brief and during oral argument to establish that Congress intended by the Treaty of 1855 to terminate completely all Chippewa claims to land in the Territory of Minnesota, with the result that all Indian treaty rights to hunt and fish were abolished. This argument is based in large part on language found in 10 Stat. 598, the enabling legislation for the Treaty of 1855, which authorized the President to negotiate with the Chippewa for the complete cession of all their land in the Territories of Wisconsin and Minnesota. But to hold, as defendants now urge, that the Chippewa completely relinquish all of their land by virtue of 10 Stat. 598, would mean that every Indian reservation in the State of Minnesota has been a legal nullity for over a century. We are persuaded that both the Treaty of 1855 and subsequent treaties, which established vast Indian reservations within this state, clearly refute this contention.

In 1889, Congress enacted the Nelson Act. The essential provisions of this act provided for the establishment of a commission, later known as the Rice Commission, to negotiate with the Chippewa "for the complete cession and relinquishment in writing of all their title and interest in and to all the reservations of said Indians in the State of Minnesota, except the White Earth and Red Lake Reservations." The Indians, upon agreement of two-thirds of all adult males, were to be relocated to the White Earth Reservation and granted specific allotments of real property in severalty.[16] Sales of the extensive agricultural and timber lands ceded were then to be conducted by the Federal government, and the proceeds of these sales were to be held in trust by the government for the benefit of the Indians. See, 4 Folwell, History of Minnesota, pp. 219 to 226. While the ostensible purpose of the Nelson Act was to relocate the Chippewa to the White Earth Reservation, § 3 of the act expressly provided:

> " * * * That any of the Indians residing on any of said reservations may, in his discretion, take his allotment in severalty under this act on the reservation where he lives at the time of the removal herein provided for is effected, instead of being removed to and taking such allotment on White Earth Reservation." 25 Stat. 643.[17]

**16.** Prior to the Nelson Act, Congress had created the Northwest Commission in 1886, which had unsuccessfully tried to negotiate with the Indians for their removal to the White Earth Reservation. See, 24 Stat. 44. A more detailed history of this commission's activities is contained in 4 Folwell, History of Minnesota, pp. 198 to 219.

**17.** See, I Kappler, Laws and Treaties, p. 303.

**18.** It should be noted that regardless of congressional intent behind the Nelson Act, few Indians ever relocated to the White Earth Reservation. In 1890, Commissioner Rice reported to the President that many Indians were distrustful of the act because of previous unfair treatment by the Federal government. See, H.R.Exec.Doc. No. 247, 51st Cong., 1st Sess. (1890). By 1894, it was estimated that only 775 Indians out of a total population of 4,000 had moved to White Earth. 4 Folwell, History of Minnesota, p. 235.

■ Although the disestablishment effect of the Nelson Act is not free from doubt, we are convinced after a review of the voluminous authorities cited to us that the act did not terminate the Leech Lake Reservation.[18] It follows that the Band, contrary to the finding of the trial court, retains unextinguished treaty rights to fish, hunt, trap, and gather wild rice in this area.[19]

This conclusion rests on our prior holding in *State v. Jackson*, 218 Minn. 429, 16 N.W.2d 752 (1944), where we reviewed the conviction of a member of the Minnesota Chippewa Tribe for shooting partridge out of season on an allotment not owned by him but located within the Leech Lake Reservation. We first held that under the previously discussed treaties the Indians had an "ancient and immemorial right to hunt and fish" within "Indian country" without state regulation. 218 Minn. 429, 16 N.W.2d 755. Since there was no congressional definition of "Indian country" under then existing law, we considered prior decisions of the United States Supreme Court that had construed this term and concluded that trust allotments located within the Leech Lake Reservation were a part of Indian country.[20] Members of the Minnesota Chippewa Tribe were thus immune from prosecution under the state game laws.

**19.** For purposes of the present appeal, it is unnecessary for us to decide whether these rights are exclusive or nonexclusive.

**20.** Subsequent to the Jackson decision, Congress defined "Indian country" by 18 U.S.C.A. § 1151. Thereafter, in 1953, P.L. 83–280 was enacted which extended state criminal and civil jurisdiction to certain offenses and actions arising in Indian country. The criminal jurisdiction provisions are now codified in 18 U.S.C.A. § 1162, and the civil jurisdiction provisions are contained in 28 U.S.C.A. § 1360. It is interesting to note that 18 U.S.C.A. § 1162(b), provides that Indians are not to be deprived of any "immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof."

Our initial opinion in the Jackson case did not discuss the possibility that the Leech Lake Reservation had been disestablished under the Nelson Act. Upon the state's motion for reargument, we addressed this question and found that, since § 3 of the act gave the Indians the option of remaining at Leech Lake rather than moving to White Earth, the Leech Lake Reservation remained intact.[21] The only portion of this land that was no longer a part of the reservation was the residue remaining after the Indians had taken their allotments in severalty.

We are further persuaded that, to the extent the Nelson Act is unclear in expressing congressional intent to terminate the Leech Lake Reservation, this ambiguity should not be resolved to the prejudice of the Indians. As has been repeatedly recognized by the United States Supreme Court, "statutes passed for the benefit of dependent Indian tribes or communities are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138, 141 (1918). Accord, *Bryan v. Itasca County, Minnesota*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); *Antoine v. Washington*, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975). This canon of construction is reflective of the fact that treaties

and statutes are "not a grant of rights to the Indians, but a grant of rights from them—a reservation of those not granted." *United States v. Winans*, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089, 1092 (1905). Had Congress intended to terminate completely the Leech Lake Reservation and the right of the Chippewa to fish thereon, we believe that it could have, and would have, expressed this intention with more definiteness and, in all likelihood, would not have permitted the Band, by § 3 of the Nelson Act, to continue to settle within the boundaries of the reservation.[22]

Given the continued existence of Indian treaty rights to fish, hunt, trap, and gather wild rice at Leech Lake, we have little difficulty in finding that § 97.431 is not violative of either state or Federal equal protection standards or the prohibition against special legislation contained in Minn.Const.1857, art. 4, § 33.[23] In reviewing equal protection challenges to legislative classifications, we have consistently upheld statutory differentiations where the classification has some natural and reasonable basis. *Blue Earth County Welfare Dept. v. Cabellero*, 302 Minn. 329, 225 N.W.2d 373 (1974); *Schwartz v. Talmo*, 295 Minn. 356, 205 N.W.2d 318, appeal dismissed, 414 U.S. 803, 94 S.Ct. 130, 38 L.Ed.2d 39 (1973). Section 97.431 was en-

**21.** More recently, the United States Supreme Court has held that the mere fact that Indians were granted allotments in order to permit sale of reservation lands to non-Indians does not necessarily mean that Congress intended to terminate the reservation. See, *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973).

**22.** A growing body of Federal law has also recognized that Indians may retain unextinguished treaty rights to hunt and fish even when their reservations have been terminated by statute. In the leading case of *Menominee Tribe v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), the United States Supreme Court held that the Menominee Tribe of Indians retained their right to hunt and fish notwithstanding the fact that the Menominee Indian Termination Act of 1954, 25 U.S.C.A. § 891 to § 911, had terminated their reservation. In the opinion of the court, Congress could not extinguish pre-existing game rights

under the treaty without using express statutory language to that effect. See, also, *Kimball v. Callahan*, 493 F.2d 564 (9 Cir.), certiorari denied, 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974); 4 American Indian L.Rev. 121. Although it is unnecessary for us to resolve the present appeal on these grounds, we note that the Nelson Act makes no mention of abolishing Chippewa game rights in the Leech Lake area. It would certainly be difficult to infer from this silence that Congress intended to deprive the Chippewa of fishing rights which, at the time the Nelson Act was passed, were crucial to their continued survival.

**23.** The standards of the equal protection clause of the Fourteenth Amendment are synonymous with the standards of equality under Minn. Const. art. 1, § 2, and Minn.Const., art. 4, §§ 33, 34. See, *Minneapolis Federation of Teachers v. Obermeyer*, 275 Minn. 347, 147 N.W.2d 358 (1966).

acted for the primary purpose of effecting a compromise between the Band, which claimed an exclusive treaty right to take fish from Leech Lake, and the state, which argued on behalf of all Minnesota citizens that the Indians were not immune from fish and game laws. The reconciliation achieved by the statute recognized only a nonexclusive Indian right to fish in Leech Lake, and in return the Band was permitted to charge a special licensing fee. The practical effect of this agreement was to preserve the valuable fishing resources found at Leech Lake while at the same time giving recognition to and compensation for historic treaty rights held by the Band. We therefore hold that the classifications created under § 97.431 were rationally related to resolving the competing claims advanced by the parties in Leech Lake I.[24] For similar reasons, defendants cannot successfully seek to overturn their convictions on the ground that § 97.431 is special legislation prohibited by Minn.Const., art. 4, § 33.[25]

■■■ Defendants finally contend that § 97.431, subd. 3, by ratifying the settlement agreement reached in Leech Lake I, permits an unconstitutional delegation of legislative power in contravention of Minn. Const. art. 3, § 1. In particular, defendants maintain that the establishment of the special licensing fee may not be delegated to the reservation business committee of the Band, which under the terms of the agree-

ment is authorized to set this fee annually in an amount not to exceed 50 percent of the state resident license fees.[26] For two reasons, this argument is not persuasive. The Band's authority to determine the special licensing fee can first be construed to be at least partially derived from treaty rights that are separate and distinct from delegations of legislative power. Secondly, the legislature is constitutionally prohibited only from delegating its exclusive power to enact a complete law. When an administrative body, such as the reservation business committee, is only empowered to determine those circumstances that will make a statute operative, the legislature has not unconstitutionally delegated its authority. *Anderson v. Commissioner of Highways*, 267 Minn. 308, 126 N.W.2d 778, 9 A.L.R.3d 746 (1964); *Lee v. Delmont*, 228 Minn. 101, 36 N.W.2d 530 (1949). Since the settlement agreement ratified by § 97.431 restricts the Band from setting the special licensing fee in excess of 50 percent of the state resident fee, we find that the legislature has not abdicated its exclusive power to enact law.

Affirmed.

WAHL, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

24. Even in the absence of treaty rights, the United States Supreme Court has frequently upheld legislation that singles out Indians for particular and special treatment. See, *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *McClanahan v. Arizona State Tax Comm.*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).

25. One minor complication with the above analysis is the fact that defendants were arrested while fishing in Sucker Bay of Leech Lake, which may not have been within the original boundaries of the reservation set by the Nelson Act and prior treaties. Although the trial court's findings are extremely cloudy on this issue, we find that § 97.431 does not deny defendants equal protection even if the settlement agreement reached in Leech Lake I extended the boundaries of the restricted fishing area to include all of the surface water area of Leech Lake. It should be obvious that enforce-

ment of the agreement would be totally unmanageable if fishermen were required to pay a special licensing fee for fishing in some areas of the lake and not in others. The classifications created by § 97.431 are thus rationally related to preventing "an impractical pattern of checkerboard jurisdiction" that would make enforcement of the agreement impossible. Cf. *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351, 358, 82 S.Ct. 424, 428, 7 L.Ed.2d 346, 351 (1962).

26. Defendants also raise the issue of unconstitutional delegation of legislative power relating to a settlement agreement provision concerning the promulgation of regulations to control harvesting of wild rice and a provision which provides that disputes over the enforcement of the agreement are to be settled by arbitration. We have carefully reviewed these issues and find them to be without merit.