_____

No. 95-4263
_____

Leech Lake Band of Chippewa        *
Indians,                           *
                                   *
       Plaintiff/Appellant,        *
                                   *
            v.                     *
                                   *
Cass County, Minnesota; Sharon     *
K. Anderson, in her official       *
capacity as Cass County Auditor;   *
Marge L. Daniels, in her           *
official capacity as Cass County   *
Treasurer; Steve Kuha, in his      *
official capacity as Cass County   *
Assessor; James Demgen, in his     *
official capacity as Cass County   *
Commissioner; John Stranne, in     *   Appeal  from  the  United  States
his official capacity as Cass      *   District Court for the  District
County Commissioner; Glen          *   of Minnesota
Witham, in his official capacity   *
as Cass County Commissioner;       *
Erwin Ostlund, in his official     *
capacity as Cass County            *
Commissioner; Virgil Foster, in    *
his official capacity as Cass      *
County Commissioner,               *
                                   *
       Defendants/Appellees.       *
                                   *
_____    *
                                   *
                                   *
                                   *
United States of America,          *
                                   *
       Amicus Curiae.              *
                                   *
White Earth Band of Chippewa       *
Indians,                           *
                                   *
       Amicus Curiae.              *
                                   *
Fond Du Lac Band of Chippewa       *
Indians,                           *
                                   *
       Amicus Curiae.              *

_____

Submitted: October 23, 1996

Filed:  March 6, 1997

_____

Before MAGILL, BRIGHT, and MURPHY, Circuit Judges.
_____

MURPHY, Circuit Judge.

This case involves the tax status of land within an Indian reservation which was once alienated from Indian ownership and subsequently reacquired by the tribe in fee simple. In 1993 Cass County, Minnesota levied an ad valorem tax on such fee land owned by the Leech Lake Band of Chippewa Indians. The Band paid the taxes under protest and sought a declaratory judgment that the land is immune from state taxation, an injunction ending the taxation, and an order refunding the taxes already paid. Based on its interpretation of County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation, 502 U.S. 251 (1992), the district court granted summary judgment for Cass County. The Band appeals. We affirm in part and reverse in part.

I.

The Leech Lake Band of Chippewa Indians is a federally recognized Indian tribe, whose reservation is located in northern Minnesota. The reservation was created by a series of treaties with the United States government, beginning in 1855 and ending with an executive order in 1874. See, e.g., Treaty with the Chippewas, Feb. 22, 1855, 10 Stat. 1165 (1855); Leech Lake Band of Chippewa Indians v. Herbst, 334 F. Supp. 1001, 1002 (D. Minn. 1971). Although the pattern of land ownership within the reservation has varied over the years, the reservation has never been disestablished or diminished. See Herbst, 334 F. Supp. at 1002 (D. Minn. 1971) (involving hunting and fishing rights); State v. Forge, 262 N.W.2d 341, 343-44 (Minn. 1977) (same).

The Band's original reservation was impacted by changes in federal Indian policy. During the latter part of the nineteenth century, the United States adopted an allotment policy in order to break up reservations previously established by treaty. This policy granted allotments of land to individual tribal members and

sold the often sizable remainder of reservation land to non-Indians.  See
Felix S. Cohen, Handbook of Federal Indian Law 127-38 (1982).  The purpose
of the policy was to open land to non-Indians and to assimilate the Indian
people into the broader American society.  Id. at 128.  The overall effect
was drastically to reduce the amount of land under Indian control.  Id. at
138.

The legislative centerpiece of the allotment policy was the General
Allotment Act (GAA), ch. 119, 24 Stat. 338 (1887), (codified as amended in
scattered sections of 25 U.S.C.) (sometimes referred to as the Dawes Act).
Under the GAA, parcels of land to be granted to individual Indians were
initially held in trust by the United States.  Section 5 of the GAA
provided that after a twenty-five year trust period, the United States
would convey the land in fee simple to the individual allottee.[1]  During
the trust period the allottees were not permitted to convey the land.
Section 6 of the GAA provided that the allottees would be subject to state
civil and criminal law.

In 1906 Congress amended the GAA by the Burke Act, ch. 2348, 34 Stat.
182 (1906).  The Burke Act amended § 6 of the GAA to make clear that
allottees would be subject to state law only after the expiration of the
trust period and issuance of a patent in fee simple.[2]  Yakima, 502 U.S. at

---

[1]Section 5 of the GAA provides the actual authorization for
issuing fee patents to individual Indian allottees.  Section 5 of
the GAA states, in part:

> [A]t the expiration of said [trust] period the United
> States will convey [the allotted lands] by patent to said
> Indian . . . in fee, discharged of said trust and free of
> all charge or incumbrance whatsoever. . . .  And if any
> conveyance shall be made of the lands set apart and
> allotted as herein provided, or any contract made
> touching the same, before the expiration of the time
> above mentioned, such conveyance or contract shall be
> absolutely null and void. . . .

25 U.S.C. § 348 (1996).

[2]After the Burke Act amendments, § 6 provides in pertinent
part:

> At the expiration of the trust period and when the lands
> have been conveyed to the Indians by patent in fee, . . . then each
> and every allottee shall have the benefit of and be subject to the
> laws, both civil and criminal, of the State or Territory in which
> they may reside. . . .  Provided, That [sic] the Secretary of the

264. The Burke Act contained a

---

Interior may, in his discretion, and he is authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed.

25 U.S.C. § 349 (1996).

proviso which enabled the Secretary of the Interior to issue a fee simple patent before the expiration of the twenty-five year trust period to "competent and capable" allottees. Burke Act, ch. 2348, 34 Stat. 182 (1906). The proviso stated that land allotted under the GAA would be free from restrictions on "sale, incumbrance, or taxation" when a patent was issued in fee. Id.; see Yakima, 502 U.S. 264 n.4.

For the Leech Lake Band and other Minnesota Chippewa tribes, the allotment policy was carried out through the Nelson Act of 1889, ch. 24, 25 Stat. 642 (1889), which partially incorporated the GAA. The Nelson Act created a commission to negotiate with the Band for the "cession and relinquishment" of its reservation land. Id. The Leech Lake Band agreed in 1889 to have land disbursed under the Nelson Act and the agreement went into effect in 1890.

The details of the negotiations with the Leech Lake Band are unclear, but there is some evidence that representatives of the United States told other Minnesota Chippewa tribes that the land allotted to the individual tribal members would not be taxed. During the negotiations a member of the White Earth Band of Chippewa Indians asked the United States' lead negotiator, Harry M. Rice, this question: "I should like to ask whether, when the Dawes bill[3] refers to the civil and criminal laws, those provisions apply so as to make our people here subject to the taxation of the white man?" Mr. Rice responded: "I think you will come within the same rule as officers at the United States forts; their property is not

_____

[3]Section 3 of the Nelson Act incorporated the Dawes Act. Nelson Act, ch. 24, 25 Stat. 642, 643 (1889)

-5-

taxed."  The Chippewa Indians in Minnesota, H.R. Ex. Doc. No. 247, at 93 (1890).  Individuals from other tribes were present during this colloquy. Id.  Cases involving other bands and other legislation have suggested that the land might only be free from taxation during the original trust period, however.  Mahnomen County, Minn. v. United States, 319 U.S. 474, 480 (1943) (Murphy, J., dissenting) (land allotted to Mahnomen County Band of Chippewa Indians under Clapp Act exempt from taxation for twenty-five years); United States v. Spaeth, 24 F. Supp. 465, 469 (D. Minn. 1938) (land allotted to a White Earth Chippewa Indian under Clapp Act exempt from taxation for twenty-five years).

The Nelson Act disposed of reservation land in three ways.  The allotment of land to individual Indians under § 3 of the Nelson Act was done in conformity with the GAA, and Leech Lake tribal members were allotted land either within the Leech Lake reservation or within the reservation of the White Earth Band of Chippewa Indians, which is also in northern Minnesota.  The rest of the land was made available to the general public.  Some was sold under §§ 4 and 5, the pine lands provisions, and the rest was sold under § 6 pursuant to the Homestead Act, ch. 75, 12 Stat. 392 (1862).

Federal Indian policy changed substantially once again in 1934 with the passage of the Indian Reorganization Act (IRA), ch. 576, 48 Stat. 984 (1934) (codified as amended at 25 U.S.C. §§ 461-479 (1996)).  The IRA reestablished federal recognition of Indian tribes, and while it did not repeal allotment statutes such as the Nelson Act, it ended the allotment policy and sought to reverse the erosion of the tribal land base by extending indefinitely the trust period for all land held by the United States in trust for Indian tribes.  25 U.S.C. §§ 461-462.  The Band is governed in part by a constitution adopted by the Minnesota Chippewa Tribes pursuant to the IRA.  See § 476.

The Leech Lake Band managed to preserve its tribal identity despite the federal allotment policy and has maintained a continuing presence on its reservation land.  During the allotment period over three quarters of the tribal members who were allotted land remained within the Leech Lake reservation boundaries.  4

Folwell, History of Minnesota 235 (1930). Nonetheless, by 1977 the Band and individual tribal members owned only 27,000 acres, or less than five percent of the reservation land. See Forge, 262 N.W.2d at 343 & n.1 (Minn. 1977). In an effort to rebuild what was lost through the allotment policy, the Band began slowly to recover its land base.

The land in question in this case consists of twenty-one parcels within the boundaries of the reservation. The legal description of each parcel is found in paragraph ten of the Band's complaint. This land was once held in trust for the Band by the United States according to terms of their treaties, but was later alienated from tribal control under provisions of the Nelson Act. Thirteen of the parcels were allotted to individual Indians under § 3 of the Act; seven parcels were sold as pine lands under §§ 4 and 5 for commercial timber harvest by non-Indians; and one parcel was distributed under § 6 as a homestead plot to a non-Indian. Subsequently, all parcels came to be held by non-Indians, but the Band reacquired each parcel in fee between 1980 and 1992.

Cass County did not impose its ad valorem tax on these parcels until 1993, one year after the Supreme Court issued its Yakima decision. The Court had held in Yakima that Indian lands originally allotted under the GAA were subject to certain types of state taxation. 502 U.S. at 270. It found that the language of § 6 of the GAA supported an ad valorem tax on such land, but not an excise tax on its sale. Id. at 266-70. The Band initially declined to pay the taxes levied by Cass County, but eventually paid under protest in order to avoid foreclosure. By July 1, 1995 it had paid a total of over $64,000 in taxes.

In June 1995, the Band filed suit in federal court seeking a declaratory judgment that the lands are not taxable by the County. The district court granted summary judgment in favor of Cass County, holding that all land alienated from tribal control under the Nelson Act was taxable. Leech Lake Band of Chippewa Indians v. Cass County, 908 F. Supp. 689 (D. Minn. 1995). The court interpreted Yakima to mean that land held by Indian tribes is taxable by the state if it is freely alienable and dismissed the

Band's case.[4]

II.

On appeal the Band contends that <u>Yakima</u> can be distinguished from the present case both factually and legally. The Band asserts that <u>Yakima</u> was concerned primarily with fee land owned by individual tribal members rather than the tribe itself. The principle of tribal sovereignty can defeat state taxation here it says.

<u>Yakima</u> cannot be so easily distinguished, however. The land involved in that case was held both by individual Indians and the tribe itself. 502 U.S. at 256, 270. Although tribal sovereignty can be an impediment to the exercise of state jurisdiction over Indians and their property, <u>see, e.g.</u>, <u>Montana v. United States</u>, 450 U.S. 544, 565-66 (1981), considerations of inherent sovereignty may not prevent certain forms of taxation. <u>Yakima</u>, 502 U.S. at 257-58 (noting that "platonic notions of Indian sovereignty . . . have, over time, lost their independent sway." (citations omitted)(internal quotations omitted)).

In <u>Yakima</u>, the county had imposed an ad valorem tax on all real property and an excise tax on the sale of such property.[5] It believed that these taxes applied to all land within the county, even land patented in fee under the GAA and owned by the Yakima Indian Nation or individual tribal members within the reservation boundaries. When the county threatened to foreclose on certain parcels for which taxes had not been paid, the tribe brought suit for declaratory and injunctive relief. The Supreme Court held that the GAA authorized the ad valorem tax levied by Yakima County, but

---

[4]Although judgment was entered in favor of the County, the court also provided an "alternative holding" under which the pine land and homestead parcels would be found not taxable since only § 3 of the Nelson Act incorporated the GAA. 908 F. Supp. at 697. The district court indicated that this would be its conclusion if <u>Yakima</u> should be read as reaffirming the long-standing principle that Congress must provide unmistakably clear intent to permit state taxation of Indian lands.

[5]In contrast, Cass County has only imposed an ad valorem tax.

-8-

not the excise tax.  502 U.S. at 270.  The ad valorem tax was acceptable because the Burke Act proviso permitted the "taxation of . . . land," and this was sufficient to overcome the Court's per se rule against state taxation of Indians or their land.  Id. at 267-68.  The language of the proviso was not sufficient to indicate Congress had authorized an excise tax on the sale of such land, however.  Id. at 268-69.

The meaning of Yakima as precedent is crucial to the outcome of the case before this court.  The Band argues that Yakima is consistent with many other cases requiring an "unmistakably clear" congressional intent to allow any form of state taxation.  According to the Band, the Court found unmistakably clear congressional intent for the ad valorem tax by examining the text and effect of both § 5 and § 6 of the GAA.[6]  Section 5 made the land to be transferred alienable, a necessary precondition to state taxation of Indian lands.  It was § 6, however, as amended by the Burke Act proviso, that provided the unmistakably clear intent to allow such taxes. The Band points out that this is the reading of Yakima adopted in Southern Ute Indian Tribe v. Board of County Comm'rs, 855 F. Supp. 1194 (D. Colo. 1994), vacated, 61 F.3d 916 (10th Cir. 1995) (on ripeness grounds). Southern Ute read Yakima to mean that the alienability established in § 5 "was not an independent justification for taxation," but rather an implication of taxability, while the specific language of § 6, as amended by the Burke Act proviso provided the "unmistakably clear" congressional intent to allow such taxation.  Southern Ute, 855 F.Supp. at 1200.

Cass County, on the other hand, argues that Yakima stands for the proposition that if Indian lands are made alienable in any way, they are taxable by the state.  Section 5 of the GAA, making allotments alienable, is seen as the key to the validity of the ad

---

[6]As discussed above, § 5 of the GAA provides that after a 25 year period during which the United States would hold allotments in trust for individual Indians, fee patents would be issued to the allottees.  Section 6 of the GAA provides that the individual Indian allottee with a fee patent would be considered a citizen subject to the laws of the state or territory in which he or she resided.

valorem tax in Yakima.  The County finds support in two cases which have interpreted Yakima to mean "alienability equals taxability." Lummi Indian Tribe v. Whatcom County, Wash., 5 F.3d 1355 (9th Cir. 1993), cert. denied, 114 S.Ct. 2727 (1993); Saginaw Chippewa Tribe v. Michigan, 882 F. Supp. 659 (E.D. Mich. 1995), rev'd, Nos. 95-1574, 95-1575, 1997 WL 20402 (6th Cir. Jan. 22, 1997).  Both Lummi and the district court in Saginaw seized on the relatively brief discussion of § 5 in Yakima as evidence that an act of Congress can subject Indian lands to state taxation by doing nothing more than making them alienable.  Lummi, 5 F.3d at 1357-58; Saginaw, 882 F. Supp. at 672.

Subsequent to oral argument in this case the Sixth Circuit reversed the Saginaw district court.  Saginaw Chippewa Tribe v. Michigan, Nos. 95-1574, 95-1575, 1997 WL 20402 (6th Cir. Jan. 22, 1997).  The Sixth Circuit concluded that Yakima was consistent with the general rule requiring unmistakable congressional intent to permit taxation of Indian land and that making land alienable does not in itself show the requisite intent. It stated the Court's holding as follows:

> In Yakima, the Supreme Court held that "by specifically mentioning immunity from land taxation as one of the restrictions that would be removed upon conveyance in fee, Congress in the Burke Act proviso manifested a clear intention to permit the state to tax such Indian lands."

Saginaw, 1997 WL 20402, at *4, citing Yakima, 502 U.S. at 259.  Despite the Sixth Circuit's thorough discussion of Yakima and earlier precedent on which the dissent relies in this case, the dissent mentions this decision only in passing.

The County's theory that alienability always equals taxability is unsatisfactory because it fails to consider the language and context of the entire Yakima opinion.  First, as the County concedes, its reading conflicts with the Yakima opinion itself and with Supreme Court precedent requiring Congress to provide unmistakably clear intent before allowing state taxation of Indians or their property.  See Yakima, 502 U.S. at 258 (citing Montana v. Blackfeet Tribe, 471 U.S. 759, 765 (1985); California v. Cabazon

-10-

Band of Mission Indians, 480 U.S. 202, 215 n.17 (1986)).

Second, in order to support its argument, the County must read Yakima as resting its conclusion solely on the effect of the alienability section of the GAA. This reading disregards the significance given by the Court to the language of § 6 of the GAA. It repeatedly pointed to the Burke Act proviso in § 6 as the primary source of clear congressional intent to allow the ad valorem tax levied by Yakima County. 502 U.S. at 258-59.

Third, the County's reading of Yakima also disregards the language and analysis in section III of the opinion. In section III, the Court separately analyzed each type of tax at issue and concluded that the § 6 Burke Act proviso authorized the ad valorem tax, but not the excise tax levied by Yakima County. 502 U.S. at 268. As the Sixth Circuit noted in Saginaw,

> Rather than finding that alienable Indian lands are subject to excise taxes on the general policy grounds advocated by the defendants, the [Yakima] Court carefully parsed the language of the General Allotment Act to determine whether or not Congress expressed an unmistakably clear intention to subject the land to such taxes.

Saginaw, 1997 WL 20402, at *5. If alienability always equals taxability, it should be the nature of the property right, not the nature of the tax, that matters. If that were the rule, the Court should have upheld both the ad valorem and the excise taxes levied by the County since the land was made alienable by the GAA. Instead, the Court refused to uphold the excise tax because it found that the language of the Burke Act proviso could not justify the imposition of such a tax. Id. at 268-70. Under the County's reading of Yakima, section III of the opinion would be superfluous and the Court would have reached a different result.

Finally, if alienability were equivalent to taxability, it is difficult to explain the terms of the remand in Yakima. That remand left open the question of whether land allotted under a

different act might be taxed or not.[7]  If alienability equaled taxability it should not have mattered under which act the land was made alienable -- the mere fact of alienability should have been enough to allow state taxation.

To determine if a state may tax Indians or their property, the Supreme Court has consistently asked whether Congress has made its intent to allow state taxation unmistakably clear.  The Court in Yakima stated the rule strongly:

> [S]tate jurisdiction over the relations between reservation Indians and non-Indians may be permitted unless the application of state laws "would interfere with reservation self-government or impair a right granted or reserved by federal law." (citation omitted)  In the area of state taxation, however, Chief Justice Marshall's observation that "the power to tax involves the power to destroy," McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 431, 4 L. Ed. 579 (1819), has counseled a more categorical approach: "[A]bsent cession of jurisdiction or other federal statutes permitting it," we have held, a State is without power to tax reservation lands and reservation Indians. Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148, 93 S. Ct. 1267, 1270, 36 L. Ed. 2d 114 (1973).  And our cases reveal a consistent practice of declining to find that Congress has authorized state taxation unless it has "made its intention to do so unmistakably clear."  Montana v. Blackfeet Tribe, 471 U.S. 759, 765, 105 S. Ct. 2399, 2403, 85 L. Ed. 2d 753 (1985); see also, California v. Cabazon Band of Mission Indians, 480 U.S. 202, 215, n. 17, 107 S. Ct. 1083, 1091, n.17, 94 L. Ed. 2d 244 (1987).

502 U.S. at 258.  Both sides in the case also framed the proper inquiry as whether the GAA evinced an unmistakably clear congressional intent to permit state taxation.  Id. at 258-60.  Yakima inquired whether Congress had made its intent to allow state

---

[7]The scope of the Yakima remand was as follows:

> The Yakima Nation contends it is not clear whether the parcels at issue in these cases were patented under the General Allotment Act, rather than under some other statutes in force prior to the Indian Reorganization Act (citations omitted).  We leave for resolution on remand that factual point, and the prior legal question whether it makes any difference.

502 U.S. at 270.

taxation unmistakably clear and found that Congress had for the ad valorem tax, but not for the excise tax.  Id.[8]

The Burke Act amendment to § 6 of the GAA was identified after inquiry as the main source of the unmistakably clear congressional intent to allow the state ad valorem tax.  For example, in the third paragraph of section II, the Court states:

> Yakima County persuaded the Court of Appeals, and urges upon us, that express authority for taxation of fee-patented land is found in § 6 of the General Allotment Act, as amended [by the Burke Act proviso] (emphasis added) (footnote omitted).  We have little doubt about the accuracy of that threshold assessment. . . .  And we agree with the Court of Appeals that by specifically mentioning immunity from land taxation "as one of the restrictions that would be removed upon conveyance in fee," Congress in the Burke Act proviso "manifest[ed] a clear intention to permit the state to tax" such Indian lands. (emphasis added) (citation omitted).

502 U.S. at 259.

The Burke Act proviso was also seen as the main source of statutory ambiguity where the state excise tax levied by Yakima County was concerned. "While the Burke Act proviso does not purport to describe the entire range of in rem jurisdiction States may exercise with respect to fee-patented reservation land, we think it does describe the entire range of jurisdiction to tax." Id. at 268 (emphasis added).  The Court concluded that the language of the proviso did not clearly permit a state excise tax, noting that "the short of the matter is that the General Allotment Act explicitly authorizes only 'taxation of . . . land,' not 'taxation with respect to land,' 'taxation of transactions involving land,' or 'taxation based on the value of land.'  Id. at 269.  "It is quite reasonable to say, in other words, that though the object of the sale here is land, that does not make land the object of the

_____

[8]The Band argues that even if alienability were always to equal taxability, the lands in this case would not be taxable because they are not alienable under the Non-Intercourse Act, 25 U.S.C. § 177 (1996).  Since this case turns on whether an unmistakably clear congressional intent has been expressed to allow state taxation of the parcels, it is not necessary to consider any issue related to the Non-intercourse Act.

-13-

tax, and hence does not invoke the Burke Act proviso [which only authorizes the 'taxation of . . . land']." Id. at 268-69.

The County counters by pointing to one particular sentence for the strongest evidence that Yakima should be read to mean alienability equals taxability. The dissent also describes this sentence as the specific holding of Yakima. The sentence states: "Thus, when § 5 rendered the allotted lands alienable and encumberable, it also rendered them subject to assessment and forced sale for taxes." Id. at 263-64. As the Sixth Circuit points out, however:

> When read out of context, this statement seems to support the defendants' claim that any congressional act making Indian land alienable is sufficient to show a clear intention to make the land subject to property tax. Within the context of the Yakima opinion, however, this statement was merely part of an explanation of the structure of the General Allotment Act.

Saginaw, 1997 WL 20402, at *2 (citations omitted) (internal quotation omitted) (emphasis added).

In the very next sentence to the one relied on by the County, the Court noted that "the Burke Act proviso, enacted in 1906, made this implication of § 5 explicit, and its nature more clear." Id. at 264. The import of this latter sentence is that § 5 only implied taxability. This reading is confirmed four sentences later when the Court states that the Burke Act proviso "reaffirmed for such 'prematurely' patented lands what § 5 of the General Allottment Act implied with respect to patented land generally: subjection to state real estate taxes." Id.

The Yakima Court thus understood § 5 to be only an implication of taxability, and § 6, as amended by the Burke Act proviso, was needed to show the necessary clear intent to tax. No court has taken the position that an implication alone is sufficient to provide unmistakably clear congressional intent to allow state taxation, and Yakima found an unmistakably clear congressional intent to allow state taxation on land by relying on both the language and effect of §§ 5 and 6, as amended, of the GAA. Without

-14-

alienability there would be no taxability, but it does not follow that alienability alone is sufficient to provide the requisite unmistakable intent.  Something like the language of the Burke Act proviso in § 6 is needed to find unmistakably clear intent to allow state taxation.  Id. at 259.

The history of the Burke Act also demonstrates that § 6, as amended, is the source of the necessary clear intent to allow state taxation of land (but not its sale).  The proviso was passed in reaction to the Supreme Court's decision in In re Heff, 197 U.S. 488 (1905),  which held that § 6 of the GAA subjected an Indian allottee to the personal jurisdiction of the state the moment the allotment in trust was made.  Yakima, 502 U.S. at 264.  Since the land was still being held in trust by the United States, it was presumably not taxable by a state even though personal jurisdiction existed over the titular owner of the land.[9]  Heff, 197 U.S. at 509 (distinguishing personal jurisdiction from jurisdiction over the land).  In re Heff thus created a situation where the state could have jurisdiction over the Indian allottee, but not over his or her land.

The purpose of the Burke Act legislation was, at least in part, to clarify the post-Heff reach of state jurisdiction over Indians receiving allotments.  Yakima, 502 U.S. at 264.  The Burke Act amendment accomplished two things.  First, it changed the point at which state law would apply to an allottee Indian from the time when a trust patent was first issued to the time when a patent was

---

[9]In the debates preceding the enactment of the Burke Act, Rep. Curtis stated:

> The main advantage of [the Burke Act] is that under [its decision in In re Heff] the Supreme Court has held that after a patent has issued [in trust], notwithstanding the Indian does not secure a title in fee for twenty-five years, he becomes a citizen of the United States, and that State courts have full jurisdiction over him, but not over his property. . . .  Now, this bill, if enacted, will leave him under the control of the [federal] Government until he secures a patent conveying the fee . . . .

40 Cong. Rec. 3599 (1906).

issued in fee.  <u>Id.</u>  Second, it made clear that an allottee could be subject to taxation upon issuance of a fee patent.  <u>Id.</u> at 259.  The Burke Act proviso to § 6 of the GAA is thus the primary source of the requisite clear congressional intent to allow state ad valorem taxes on Indian lands.

The <u>Yakima</u> Court discussed § 5 and alienability in a single paragraph of section II of its opinion.  That paragraph addressed the relevance of <u>Goudy v. Meath</u>, 203 U.S. 146 (1906), to the arguments of the Yakima Nation and the United States as amicus.[10]  <u>Goudy</u> had held that an Indian allottee could be personally liable for delinquent real estate taxes on fee land allotted under the GAA.  The <u>Goudy</u> Court found liability for two reasons.  First, the Court noted that it would be strange for Congress to remove restrictions on alienation of the land and not subject it to taxation.  <u>Id.</u> at 149.  Second, the Court found that the language of § 6 extended the laws of the state or territory to the Indian allottee, including the state tax laws.  <u>Id.</u> at 149-50.

<u>Yakima</u> characterized the <u>Goudy</u> decision as one in which alienation was of central significance to the finding of liability.  502 U.S. at 263.  The Court never suggested that <u>Goudy</u> relied exclusively on the alienability of the land.  Instead, the <u>Goudy</u> decision premised liability on both the alienability of the land and the specific language of § 6 of the GAA.  <u>Goudy</u>, 203 U.S. at 149-50.  <u>Goudy</u> is therefore analogous to <u>Yakima</u> where the Court

---

[10]The Court discussed alienability and <u>Goudy</u> to distinguish <u>Moe v. Confederated Salish and Kootenai Tribes</u>, 425 U.S. 462 (1976), from the case of Yakima Nation.  <u>Moe</u> had held that § 6 of the GAA did not give a state general personal jurisdiction over Indians within a reservation.  425 U.S. at 478.  In <u>Yakima</u> the tribe and the United States argued that <u>Moe</u> meant a state could not impose an ad valorem tax on Indian land, 502 U.S. at 262, but the Court felt that this interpretation of <u>Moe</u> amounted to an implied repeal of § 6 and it was not willing to read <u>Moe</u> that broadly.  <u>Id.</u> Instead the Court concluded that, as in <u>Goudy</u>, a contributing factor to the taxability of the land was that it had been made alienable under § 5.  The <u>Yakima</u> Court raised <u>Goudy</u> and alienability, not to depart from its precedent requiring an unmistakably clear congressional intent to allow state taxation, but in order to distinguish <u>Moe</u> and to demonstrate that § 6 remained a viable source of unmistakable intent for in rem taxing jurisdiction.

-16-

relied on both the express language of § 6, as amended by the Burke Act proviso,[11] and the § 5 alienability of the land, which created the necessary conditions for taxation.

In sum, the County's reading of <u>Yakima</u> conflicts with other language in the opinion itself, and with strong Supreme Court precedent espousing an unmistakably clear congressional intent rule. While the Court considered alienability as one factor contributing to the taxability of the land, alienability alone was not sufficient to allow state taxation. The express language of the Burke Act proviso in § 6 of the GAA was needed to make sufficiently clear the intent of Congress to allow state ad valorem taxes.

III.

The parcels of land involved in this case were alienated from tribal control by the Nelson Act and subsequently reacquired by the Band in fee. State taxation of Indian land is not authorized unless Congress "has made its intention to do so unmistakably clear." <u>Yakima</u>, at 258, <u>quoting</u> <u>Montana v. Blackfeet Tribe</u>, 471 U.S. at 765. The question in this case is whether the Nelson Act evinces an "unmistakably clear" congressional intent to allow an ad valorem tax on these parcels.

Eight of the 21 lots were sold as pine lands or distributed as homestead lands under § 4, § 5, or § 6 of the Nelson Act. These sections of the Act, unlike § 3, did not incorporate the GAA or include any mention of an intent to tax lands distributed under them which might become reacquired by the Band in fee. These parcels are therefore not subject to state taxation.

Section 3 of the Nelson Act allotted certain lands on the

---

[11]The district court suggested that the Burke Act amendment reaffirmed the Supreme Court decision in <u>Goudy</u>. That amendment actually predated the <u>Goudy</u> decision, however. The Burke Act was passed on May 8, 1906, and <u>Goudy</u> was decided on November 19, 1906. Although the <u>Goudy</u> opinion does not specifically mention the language of the Burke Act proviso, that language was presumably available for the consideration of the Court.

Leech Lake reservation by incorporating the mechanisms of the GAA. The Band argues that the GAA itself does not evince an unmistakably clear intent to allow ad valorem taxes on tribally held land because §§ 5 and 6 of the GAA only address the allotment of land to individual Indians, but that argument cannot be reconciled with the holding of the Supreme Court in Yakima. Yakima held[12] that after the addition of the Burke Act proviso, lands allotted under the GAA are subject to state ad valorem taxes when they are patented in fee. 502 U.S. 266-70. This is true for both lands allotted to individual Indians and lands subsequently reacquired by a tribe. See id. at 256, 270. For these reasons the land which passed under § 3 of the Nelson Act is taxable if it was patented after the passage of the Burke Act proviso in 1906, but not if it were patented before then.[13]

---

[12]The Court specifically stated:

> We hold that the General Allotment Act permits Yakima County to impose an ad valorem tax on reservation land patented in fee pursuant to the Act, but does not allow the county to enforce its excise tax on the sale of such land.

502 U.S. at 270. This explicit statement of the holding follows the Court's discussion in section III describing how the language of the Burke Act proviso provides the unmistakably clear congressional intent to allow the state ad valorem tax, but not the excise tax. The dissent locates what it views as the holding elsewhere in a paragraph discussing the Court's previous decision in Goudy. We follow the explicit holding as stated by the Supreme Court.

[13]In theory, every parcel in dispute here should have been patented in fee after 1906. The Nelson Act was passed in 1890. Given a twenty-five year trust period, the earliest a fee patent should have issued was 1915. The administration of the allotment policy was not always smooth or consistent, however. See Felix S. Cohen, Handbook of Federal Indian Law 132-34 (1982) (describing "piecemeal process" of amending and developing the allotment program after the passage of the GAA). The record does not reveal when these parcels were patented in fee, and it is possible, if not likely, that some were patented before 1906. See, e.g., United States v. Thurston County, Neb., 143 F. 287, 288 (8th Cir. 1906) (noting 1902 amendment to the GAA allowed Indian devisee to sell or convey inherited allotment before expiration of trust period); Nat'l Bank of Commerce v. Anderson, 147 F. 87, 90 (9th Cir. 1906) (same); see also LeAnn Larson LaFave, South Dakota's Forced Fee Indian Land Claims: Will Landowners be Liable for Government's Wrongdoing?, 30 S. D. Law Rev. 59, 65 & n.42 (1984) (noting congressional practice of issuing premature fees through special legislation before 1906); Delos Sacket Otis, The Dawes Act and the Allotment of Indian Lands 150-51 (F. Prucha ed., University of Oklahoma Press 1973) (same).

In sum, the judgment in favor of the County is vacated. The district court is affirmed in its determination that the County may apply its ad valorem tax to land allotted under § 3 of the Nelson Act, unless any parcel is shown to have been patented in fee before the passage of the Burke Act. The judgment is reversed as to the parcels which passed under the pine lands or homestead sections of the Act and the case is remanded for consideration of that portion of the Band's claim for refunds which is still relevant and for any necessary proceedings consistent with this opinion.

MAGILL, Circuit Judge, concurring in part and dissenting in part.

I concur in section III of the majority opinion to the extent that it affirms the district court's conclusion that the allotted lands in this case were properly taxed by Cass County. I respectfully dissent from the remainder of the majority's decision.

In 1993 Cass County, Minnesota, (County) began imposing ad valorem taxation on lands held in fee simple by the Leech Lake Band of Chippewa (Band), a federally recognized Indian tribe, on the Leech Lake Reservation.[14] The Band brought this action in the district court seeking injunctive relief from future taxation by the County and a judgment for the $64,000 in taxes which it has

---

[14]This case involves twenty-one parcels of land which were originally held in common by the Band under aboriginal title and which were subsequently held in trust by the United States. In 1889 Congress enacted the Nelson Act, ch. 24, 25 Stat. 642, which allotted land held in common by the Band to individual Indians. Thirteen of the parcels in this case were so allotted and eventually became alienable. The Nelson Act also disposed of surplus lands, including lumbering lands (pine lands) and homesteads, to non-Indians. Seven of the parcels were originally sold as pine lands, and the remaining parcel was originally sold as a homestead. The twenty-one parcels were reacquired by the Band after 1980. Some of the land is undeveloped, while there are tribal facilities on other parcels. Although the Band successfully converted other reacquired lands--including a casino--to trust status, see Summ. J. Tr. at 9; see also 25 U.S.C. § 465 (statutory procedure for placing lands in trust with the United States), the title to the twenty-one parcels at issue in this case are held by the Band in fee simple.

-19-

paid, under protest, to the County.  Relying on <u>County of Yakima v. Yakima Indian Nation</u>, 502 U.S. 251 (1992), the district court held that the taxation had been proper, and granted summary judgment to the County.  I would affirm.

In <u>Goudy v. Meath</u>, 203 U.S. 146 (1906), the United States Supreme Court held that alienable lands held by a member of the Puyallup Tribe were subject to state taxation.  The Court reasoned:

> That Congress may grant the power of voluntary sale, while withholding the land from taxation or forced alienation, may be conceded. . . . But while Congress may make such provision, its intent to do so should be clearly manifested, for the purpose of the restriction upon voluntary alienation is protection of the Indian from the cunning and rapacity of his white neighbors, and it would seem strange to withdraw the protection [of the restriction on alienation] and permit the Indian to dispose of his lands as he please, while at the same time releasing it from taxation. . . . Among the laws to which the plaintiff as a citizen became subject were those in respect to taxation.  His property, unless exempt, became subject to taxation in the same manner as property belonging to other citizens, and the rule of exemption for him must be the same as for other citizens--that is, that no exemption exists by implication but must be clearly manifested.

<u>Id.</u> at 149.  Relying on this reasoning, the United States Supreme Court in <u>Yakima County</u> held that lands originally allotted to Yakima Indians pursuant to the General Allotment Act of 1887, also known as the Dawes Act, ch. 119, 24 Stat. 388, codified in part as amended at 25 U.S.C. § 331, and which were subsequently held by individual Indians and the tribe in fee simple were subject to county ad valorem taxation.  The <u>Yakima County</u> Court specifically held that

> when § 5 [of the General Allotment Act] rendered the allotted lands alienable and encumberable, it also rendered them subject to assessment and forced sale for taxes.

507 U.S. at 263-64.

In <u>Lummi Indian Tribe v. Whatcom County, Wash.</u>, 5 F.3d 1355 (9th Cir. 1993), <u>cert. denied</u>, 114 S. Ct. 2727 (1994), the Ninth Circuit accepted this clear pronouncement by the Supreme Court that alienability of land allowed taxation of the land, and held that:

-20-

> The logic propounded by the <u>Goudy</u> Court and approved by <u>Yakima Nation</u> requires an Indian, even though he receives his property by treaty, to accept the burden as well as the benefits of land ownership. This proposition may be hard to square with the requirement, recently approved by the <u>Yakima Nation</u> Court, that Congress' intent to authorize state taxation of Indians must be unmistakably clear. The strength of the language in <u>Yakima Nation</u>, however, makes virtually inescapable the conclusion that the Lummi land is taxable if it is alienable.

<u>Id.</u> at 1358 (allowing county taxation of alienable land held by tribe). <u>But see</u> <u>United States on Behalf of Saginaw Chippewa Tribe v. Michigan</u>, 1997 FED App. 0026P (6th Cir. Jan. 22, 1997) (rejecting <u>Lummi</u> court's interpretation of <u>Yakima County</u> and holding that alienability does not necessarily allow taxation).

Rather than accept the clear rule propounded by the <u>Yakima County</u> Court that alienability allows taxation, the majority declares that the homestead lands and pine lands in this case are exempt from taxation, and engages in a strained analysis of the <u>Yakima County</u> decision that eviscerates its holding. For example, because the <u>Yakima County</u> Court supported its conclusion that the land in question was taxable by noting that "[t]he Burke Act proviso, enacted in 1906, made this implication of § 5 explicit, and its nature more clear," 507 U.S. at 264, the majority concludes that the Burke Act analysis was necessary to the <u>Yakima County</u> Court's conclusion.[15] <u>See</u> Maj. Op. at 12-13. The majority insists that § 5's grant of alienability did not allow taxation, asserting that "[n]o court has taken the position that an implication alone is sufficient to provide unmistakably clear congressional intent to allow state taxation . . . ." <u>Id.</u> at 13. This statement simply

---

[15]It is clear that the <u>Yakima County</u> Court's analysis of the Burke Act was nothing more than additional support for its holding that alienability resulted in taxability. As the Court stated:

> [T]he [Burke Act] proviso <u>reaffirmed</u> for such "prematurely" patented land what § 5 of the General Allotment Act implied with respect to patented land generally: subjection to state real estate taxes.

<u>Yakima County</u>, 507 U.S. at 264 (emphasis added). I note that, as a matter of plain logic, a "reaffirmation" supports, rather than controls, a conclusion. In addition, rather than being limited by the Burke Act's provision for the taxation of only prematurely patented land, the <u>Yakima County</u> Court allowed taxation over all land allotted under the General Allotment Act. <u>See</u> <u>id.</u> at 270.

-21-

disregards the Yakima County Court's treatment of § 5, and is strongly reminiscent of the Yakima County dissent:

> The majority concedes that § 5 only "implied" this conclusion. In my view, a "mere implication" falls far short of the "unmistakably clear" intent standard.

507 U.S. at 273 (Blackmun, J., dissenting) (citations omitted).[16]

While I can understand the majority's disinclination to accept Yakima County's holding, it is nevertheless binding precedent, and should have been followed in this case. Under the clear language of Yakima County, alienability of land allows taxation of land. Because all of the lands in this case are fully alienable by the Band,[17] the district court properly followed the Supreme Court's clear holding in Yakima County and held that the lands are subject

---

[16]In reaching its decision to disregard Yakima County's clear holding, the majority also relies on the Yakima County Court's remand for a factual determination of "whether the parcels at issue in these cases were patented under the General Allotment Act, rather than under some other statutes in force prior to the Indian Reorganization Act," and the legal determination of "whether it makes any difference." 507 U.S. at 270. I suggest that this remand was either an effort to avoid creating needless dicta, or a reference to the unusual situation noted in Goudy, where Congress could explicitly exempt land from taxation, despite making it alienable. See Goudy, 203 U.S. at 149. In any event, I do not believe that the remand, particularly considering the phrasing of "whether it makes any difference," can override the clear statement that a statute making land alienable also makes it taxable.

[17]Before both the district court and this appellate panel, the Band argued that the Nonintercourse Act, 25 U.S.C. § 177, limited the alienability of all lands held by an Indian tribe, including recently acquired lands held in fee simple. The district court rejected this argument, see Order at 14, as have most courts which have considered it. See, e.g., Lummi Indian Tribe v. Whatcom County, Wash., 5 F.3d 1355, 1359 (9th Cir. 1993) ("No court has held that Indian land approved for alienation by the federal government and then reacquired by a tribe again becomes inalienable. To the contrary, courts have said that once Congress removes restraints on alienation of land, the protections of the Nonintercourse Act no longer apply. Moreover, the statutory authorization for the sale of Indian land following proper government approval makes no mention of reimposing restrictions should a tribe reacquire the land. Rather, the broad statutory language suggests that, once sold, the land becomes forever alienable." (citations omitted)), cert. denied, 114 S. Ct. 2727 (1994). The majority has declined to consider this issue. See Maj. Op. at 12 n.8.

to taxation by the County.

I agree with the majority's conclusion in section III of its opinion that the lands originally allotted to Indians are taxable by the County. I disagree, however, with its conclusion that the pine lands and homestead parcel are not. Accordingly, I would affirm the district court's judgment in its entirety.


A true copy.

Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.